ROCK CAPITAL MARKETS LLC and
SYNOVA ASSET MANAGEMENT LLC, on
behalf of themselves and all others similarly
situated,

               Plaintiffs,

        v.

NATWEST MARKETS SECURITIES INC.,
NATWEST MARKETS PLC, NATWEST
GROUP PLC, and JOHN DOES 1-20,

               Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

NATURE OF THE ACTION................................................................................................1

JURISDICTION AND VENUE ........................................................................................3

THE PARTIES....................................................................................................................4

    I.      Plaintiffs ...............................................................................................................4

    II.     Defendants ...........................................................................................................5

        A.      NatWest Group Plc................................................................................5

        B.      NatWest Markets Plc .............................................................................5

        C.      NatWest Markets Securities Inc. ..........................................................5

        D.      John Doe Defendants ............................................................................6

FACTUAL ALLEGATIONS ..............................................................................................7

    I.      Relevant Factual Background ...............................................................................7

        A.      Overview of Treasury Securities............................................................7

        B.      Overview of Treasury Futures ...............................................................8

                1.      Overview of Key Terms...........................................................8

                2.      The CME Group ....................................................................10

        C.      The Mechanics of Spoofing .................................................................13

    II.     Evidence of Defendants' Misconduct ................................................................17

        A.      Overview of Government Settlements ..................................................17

        B.      NatWest is an Active Participant in the U.S. Treasuries Market ...................18

        C.      Defendants' Manipulation of Treasury Futures .................................................19

                1.      July 25, 2012 – Ultrabond T-Bond Futures..........................20

                2.      June 24, 2013 – 10-Year T-Note Futures .............................21

                3.      May 14, 2014 – Ultrabond T-Bond Futures & 30-Year Treasury Bonds ....................................................................................21

        D.      Defendants Failed to Supervise Their Treasuries Futures Traders ...............22

CLASS ACTION ALLEGATIONS ........................................................................................22

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ...........................................24

FIRST CLAIM FOR RELIEF ...........................................................................................25

SECOND CLAIM FOR RELIEF........................................................................................26

THIRD CLAIM FOR RELIEF ..........................................................................................27

FOURTH CLAIM FOR RELIEF .......................................................................................28

PRAYER FOR RELIEF ...................................................................................................28

DEMAND FOR JURY TRIAL...........................................................................................29

Plaintiffs Rock Capital Markets LLC and Synova Asset Management LLC (collectively, "Plaintiffs"), complain upon knowledge, as to themselves and their own actions, and upon information and belief, as to all other matters, against Defendants NatWest Markets Securities Inc. (formerly RBS Securities Inc.), NatWest Markets Plc (formerly The Royal Bank of Scotland Plc)., NatWest Group Plc (formerly The Royal Bank of Scotland Group Plc), and John Doe Nos. 1-20 (collectively, "Defendants").

Plaintiffs' allegations and claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiffs' counsel.

Plaintiffs bring this class action for damages and allege as follows:

## NATURE OF THE ACTION

1.     This action arises from Defendants' unlawful and intentional manipulation of U.S. Treasury futures contracts ("Treasury Futures") and options on U.S. Treasury futures contracts ("Options on Treasury Futures") (together, "Treasury Futures and Options"), traded on United States-based exchanges including the Chicago Board of Trade ("CBOT")[1] during the period from at least January 1, 2008 through May 31, 2014 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), and the common law.

2.     On December 21, 2021, Defendant NatWest Markets Plc ("NatWest Markets") entered into a Plea Agreement (the "Plea Agreement") with the United States Department of Justice Criminal Division, Fraud Section ("DOJ") and the United States Attorneys' Office for the District of Connecticut ("USAO-CT") to resolve criminal charges that NatWest Markets and NatWest Markets

---

[1] CBOT is a designated contract market that is, and was at all relevant times, owned and operated by CME Group, Inc.

Securities Inc. ("NMSI") defrauded other market participants in the Treasury Futures market between at least January 2008 through May 2014.[2]

3.      Treasury Securities are marketable debt securities—sold in the form of bills, notes, bonds, and other instruments—issued by the United States government that earn interest through their maturity date, at which time the "par" amount (equal to the principal) is returned to the owner. Treasury Futures are standardized agreements to buy or sell Treasury Securities, at a specified date in the future.

4.      Defendants manipulated the prices of Treasury Futures using a manipulative device known as "spoofing." In other words, Defendants placed orders for Treasury Futures with the intent, at the time the orders were placed, to cancel those orders before they could be executed.  By doing so,  Defendants sent false and illegitimate supply and demand signals to an otherwise efficient market.[3] As a result, Defendants caused Treasury Futures prices to be artificial throughout the Class Period to benefit themselves financially, at the expense of other investors, like Plaintiffs and the Class.

5.      Defendants engaged in  at least hundreds of manipulative acts throughout the Class Period, and successfully manipulated the Treasury Futures market, and caused artificial prices.

6.      Pursuant to the Plea Agreement, Defendants paid approximately $35 million in criminal monetary penalties, criminal disgorgement, and restitution in connection with Defendants' manipulation of Treasury markets.[4]

---

[2] Plea Agreement, *United States of America v. NatWest Markets Plc*, No. 21-cr-0187 (D. Conn. Dec. 21, 2021) *available at* https://www.justice.gov/opa/press-release/file/1457986/download (hereinafter, "Plea Agreement"); *see also* Information, *United States of America v. NatWest Markets Plc*, No. 21-cr-0187 (D. Conn. Dec. 21, 2021) *available at* https://www.justice.gov/opa/press-release/file/1457981/download (hereinafter, "Information"); Press Release, *NatWest Markets Pleads Guilty to Fraud in U.S. Treasury Markets: Global Banking and Financial Services Firm to Pay $35 Million in Fine, Restitution, and Forfeiture*, Department of Justice (Dec. 21, 2020), *available at* https://www.justice.gov/opa/pr/natwest-markets-pleads-guilty-fraud-us-treasury-markets.

[3] Plea Agreement, Attachment A - Statement of Facts ("Plea SOF"), at A-3 ¶ 9

[4] Plea Agreement ¶ 20.

7. Defendants admitted that during the Class Period, Defendants and their employees:

knowingly, willfully, and with the intent to defraud placed orders to buy and sell certain U.S. Treasuries with the intent to cancel those orders before execution ("Spoof Orders"), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for U.S. Treasuries.[5]

8. Pursuant to the Plea Agreement, Defendant NatWest Markets also "admit[ted], agree[d], and stipulate[d] that it is responsible for the acts of its officers, employees, and agents described in the Information, and [the Statement of Facts]."[6]

9. This is not the first time Defendants have manipulated financial markets. As the DOJ explained, Defendant NatWest Markets has a "substantial prior criminal history" including a deferred prosecution agreement related to manipulation of LIBOR, a guilty plea related to manipulation of foreign-exchange rates, and a non-prosecution agreement related to fraudulent misrepresentations in the purchase and sale of collateralized loan obligations and residential mortgage-backed securities.[7]

10. Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered through discovery.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because this action arises under Section 22 of the CEA, 7 U.S.C. § 25. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

---

[5] Plea SOF, at A-3 ¶ 9; *see also* Plea Agreement ¶ 14.

[6] Plea Agreement ¶ 14.

[7] Plea Agreement ¶ 6.c.

12.    Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391(b), (c), and (d), and Section 22 of the CEA, 7 U.S.C. § 25(c).  One or more of the Defendants resided, transacted business, were found, or had agents in the District.  Further, a significant part of the events giving rise to the claims occurred in the Northern District of Illinois. The CBOT, the exchange where the alleged manipulation occurred, is in Chicago, Illinois and the CME's Globex electronic trading system (through which electronic trading on the CBOT occurs) utilizes servers located in Chicago and Aurora, Illinois.

13.    Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.  Treasury Futures are commodities that trade in interstate commerce in the United States.

## THE PARTIES

### I.    Plaintiffs

14.    Plaintiff Rock Capital Markets LLC ("Rock Capital") was at all relevant times an Illinois limited liability company.  Plaintiff Rock Capital transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Rock Capital and the Class of the ability to transact in a lawful market that was free of manipulation.  As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Rock Capital was harmed as described below and suffered economic injury as a result.

15.    Plaintiff Synova Asset Management, LLC ("Synova") was at all relevant times an Arizona limited liability company.  Plaintiff Synova transacted in Treasury Futures during the Class

Period, including purchases and sales of futures on the CBOT and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Synova and the Class of the ability to transact in a lawful market that was free of manipulation. As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Synova was harmed as described below and suffered economic injury as a result.

## II.     Defendants

### A.     NatWest Group Plc

16.     Defendant NatWest Group Plc ("NatWest Group") is a public limited company under U.K. law based in Edinburgh, Scotland. NatWest Group was previously named The Royal Bank of Scotland Group Plc.

17.     NatWest Group is a bank holding company and is the ultimate parent company of Defendants NatWest and NMSI.

### B.     NatWest Markets Plc

18.     Defendant NatWest Markets Plc ("NatWest Markets") is a public limited company under U.K. law and is headquartered in Edinburgh, Scotland. NatWest Markets was previously known as The Royal Bank of Scotland Plc.

19.     Throughout the Class Period, a London-based employee of NatWest Markets identified by the DOJ as Trader-1 ("Trader-1") engaged in spoofing in the course of his employment with NatWest Markets.

### C.     NatWest Markets Securities Inc.

20.     Defendant NatWest Markets Securities Inc. ("NMSI") is a Delaware corporation headquartered in Stamford, Connecticut. NMSI is a U.S. broker-dealer subsidiary of NatWest Markets and is registered with the SEC as a broker-dealer and investment adviser. NMSI is also a registered

futures commission merchant ("FCM") with the U.S. Commodity Futures Trading Commission ("CFTC").

21. NMSI operates as a wholly owned subsidiary of NatWest Group. During the Class Period, NMSI served as a primary dealer of U.S. Treasury Securities and transacted in U.S. Treasury-based instruments, including Treasury Futures.

22. Throughout the Class Period, a Stamford, Connecticut-based employee of NMSI identified by the DOJ as Trader-2 ("Trader-2") engaged in spoofing in the course of his employment with NMSI.

23. Collectively, NatWest Group, NatWest Markets, and NMSI are referred to as "NatWest."

**D. John Doe Defendants**

24. Defendants John Doe Nos. 1-20 are persons and entities employed by or affiliated with NatWest or others that directly or indirectly inappropriately manipulated or attempted to manipulate the trading and prices of Treasury Futures. The defined term "Defendants" also includes these John Doe Defendants.

25. During the Class Period, Defendants' subsidiaries or other affiliates or employees of Defendants joined and furthered the manipulation of Treasury Futures, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit. The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

26. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

27. Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

I. **Relevant Factual Background**

A. **Overview of Treasury Securities**

28. **U.S. Treasury Securities.** The U.S. Treasury sells marketable securities in the form of bills, notes, and bonds to institutional and individual investors through investment companies and banks at public auctions. This debt is subject to fixed terms, *e.g.*, 2-year, 5-year, 10-year, and 30-year terms, at fixed interest rates determined by the prevailing interest rates in the marketplace at the time of issuance of the bonds. Treasury bills, notes, and bonds are referred to as marketable securities because after they are sold in auctions, they are generally bought and sold in the secondary cash market at prevailing prices from dealers in government securities. Many instruments bought and sold by market participants are also linked to Treasury yields/prices. As of December 2020, more than $20 trillion in U.S. Treasury Securities outstanding.[8]

29. **U.S. Treasury Bills.** U.S. Treasury bills ("T-Bills") are Treasury bills with maturities ranging from four (4) weeks to fifty-two (52) weeks. T-Bills are purchased at a discount to par value (*i.e.*, face value) as they do not pay interest prior to maturity.

30. **U.S. Treasury Notes.** U.S. Treasury notes ("T-Notes") have maturities between 1-year to 10-years and are issued with maturities of two (2), three (3), five (5), seven (7), and ten (10) years. T-Note interest is paid semiannually, and the principal is paid upon maturity.

---

[8] The Bureau of the Fiscal Service, *Monthly Statement of the Public Debt of the United States* (Dec. 31, 2020), *available at*: https://www.treasurydirect.gov/govt/reports/pd/mspd/2020/opds122020.pdf.

31.     **U.S. Treasury Bonds.**  U.S. Treasury bonds ("T-Bonds") are bonds with original maturities of greater than ten (10) years at time of issuance.  T-Bond interest is paid semiannually, and the principal is paid upon maturity.

32.     T-Bills, T-Notes, and T-Bonds have two sides:  the "long" side, which is the buy side of the security, and the "short" side, which is the sell side of the security.  T-Notes and T-Bonds are priced based on their par value, the public demand for the debt, prevailing interest rate yields, and coupon rate.  The par value is the face value of the T-Note or T-Bond.  The coupon rate is the annual interest rate, as a percentage of par value, paid on a T-Note or T-Bond as determined by the U.S. Treasury Department.  For example, a $1,000,000 T-Note with a coupon rate of 3% will pay $30,000 a year total, paid as two $15,000 semiannual payments.

### B.     Overview of Treasury Futures

#### 1.     Overview of Key Terms

33.     **Commodity Futures Contract.**  A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price and time in the future.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.  The commodity underlying a futures contract can be a physical commodity, *e.g.*, corn or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index.  Pursuant to Section 5 of the CEA, 7 U.S.C. § 7, Designated Contract Markets ("DCMs") such as CME, CBOT, NYMEX, and COMEX specify the terms for each of the futures and options contracts they list, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

34.     **"Long" and "Short" Futures.**  Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a

defined point in the future. Treasury Futures are deliverable upon expiry. However, futures contracts can also be offset prior to expiration.

35. **Offset by Trading.** Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs. For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract. This sale of one contract offsets or liquidates the earlier purchase of another contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

36. **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, Treasury Futures).

37. **Call option.** A call option confers upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer," the obligation to sell the commodity at the strike price. The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

38. **Put options.** A put option confers upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price and confers upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at

above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay at or above the strike price of the put option so that the seller of the option would not be forced to buy the underlying futures contract at an above-market price.

39.     **Treasury Futures.** Treasury Futures are deliverable baskets of U.S. Treasuries, fixed-income securities issued and backed by the U.S. government to finance debt.[9] Treasury Futures provide market participants the ability to manage their interest rate exposure. Like other commodity futures contracts, a Treasury Futures contract is a standardized agreement to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future.

40.     Since the first Treasury Futures products were launched over forty (40) years ago, CBOT Treasury Futures have become one of the CME's core interest rate products. Presently, Treasury Futures primarily trade through CME Globex, though certain option contracts are still traded through open outcry. During the Class Period, U.S. Treasury Futures traded on the CBOT included: (i) 2-year T-Note Futures; (ii) 5-year T-Note Futures; (iii) 10-year T-Note Futures; (iv) U.S. Treasury Bond Futures; and (v) Ultra U.S. Treasury Bond Futures. Options are generally available on U.S. Treasury Futures contracts. Treasury Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract. According to the CME, in November 2021, the average daily volume was 6.7 million Treasury Futures contracts and 1.1 million Options on Treasury Futures contracts.[10]

### 2.     The CME Group

41.     The CME Group Inc. ("CME Group") is one of the world's largest derivatives exchanges. Its global headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606. In

---

[9] As set forth above, references to Treasury Futures are to CBOT Treasury Futures and Options on CBOT Treasury Futures contracts, unless otherwise noted.

[10] CME Group Exchange ADV Report - Monthly (Nov. 2021), *available at*: https://www.cmegroup.com/daily_bulletin/monthly_volume/Web_ADV_Report_CMEG.pdf.

2007, the CME Group merged with the Chicago Board of Trade ("CBOT"), a Designated Contract Market offering products subject to CBOT rules and regulations. CBOT brought a suite of interest rates, agricultural, and equity index products to CME Group's existing offering. Today, the CME Group is made up of at least four exchanges, CME, CBOT, NYMEX, and COMEX. Each exchange offers a wide range of global benchmarks across major asset classes.

42.     The CME Group also owns and operates CME Globex, an electronic trading platform that is used to trade futures and options contracts. Because CME Globex is an open access marketplace, it allows market participants to directly enter their own trades and participate in the trading process, including viewing the order book and real-time price data nearly 24 hours a day. CME Globex is subject to CME rules including those that (a) govern the conduct of CME Globex users and (b) provide for disciplinary sanctions including but not limited to exclusion from trading.

43.     CME Globex utilizes an electronic "Order Book" that displays quantities of anonymous orders or offers to sell futures contracts and bids to buy futures contracts at various price points or "levels." An "order" is a request to buy (a "bid") or sell (an "offer" or "ask"). The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level. The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between these two prices.

44.     Quotes to buy or sell are entered into the order book, which allows market participants to see the visible number of orders and the visible total number of contracts that all traders are actively bidding or offering at a given price level. The identities of traders who submit quotes into the order book are anonymous. Thus, here for instance, market participants could not tell if Defendants serially placed and then cancelled orders on opposite sides of the market.

45.     Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels. This combined bid and ask information is often referred to as the visible order book

and represents the visible market depth (an illustrative example of a visible order book is contained in FIGURE 1).



**FIGURE 1.**

46. An "aggressive order" is an order that crosses the bid-ask spread, meaning the order is placed at a price where there is already a counterparty willing to take the other side of a trade, *i.e.*, the order is placed at a price where another trader is already willing to transact. Practically speaking, an aggressive buy order would be placed at the first-offer level or higher; and an aggressive sell order would be placed at the first-bid level or lower. Accordingly, aggressive orders are guaranteed to execute, at least in part, immediately after being placed.

47. By contrast, a "passive order" does not give up the spread in price. On the buy side of the market, a passive buy order is placed at the best-bid price or lower, *i.e.*, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell. A passive sell order

would be placed at the best-offer/ask price or higher. Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

48.     CME Globex bids and offers for outright futures are matched according to an algorithm on a first-in, first-out ("FIFO") basis. Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority. Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size. Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue. Iceberg orders refer to large single orders that are divided into smaller limit orders for the purpose of hiding the actual order quantity. The term "iceberg" comes from the fact that the visible lots are just the "tip of the iceberg" given the greater number of limit orders ready to be placed.

### C.     The Mechanics of Spoofing

49.     The U.S. Treasury Futures market is susceptible to manipulation. "Spoofing" is a manipulative trading device used to create artificial prices in markets. Specially, the practice entails submitting bids or offers with the intent to cancel those bids or offers at the time they are placed. Rather than reflecting legitimate supply and demand, these spoof orders are entered with the intent to create artificial price movements upwards or downwards by artificially creating the impression of increased supply or demand in the market.

50.     Spoofing works by using orders to create a false impression of supply or demand that impacts futures contract prices. For example, if a trader wants to buy at an artificially lower price, he may place an order (this could also be called a "Primary Order"), often in the form of an iceberg order, to buy Treasury Futures contracts at a price below the lowest ask price then available in the market, *i.e.*, a price lower than where any market participant would be willing to sell. The trader will then spoof prices lower by placing one or more large orders—orders the trader never intends to execute—

to *sell* a substantial amount of the same contract on the opposite side of the market. These orders are called the "spoof orders." Spoof orders are made at a price that is at or above the first-ask level (the lowest ask price available in the market), meaning that they are passive orders that will not be immediately filled. These large orders falsely signal that investors are selling their Treasury Futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the initial buy order. The manipulator cancels the large spoof orders before they get filled so the trader never enters a transaction at that price level.

51. FIGURES 2a and 2b below show the order book imbalance that spoofing causes. FIGURE 2a is a hypothetical order book. The best bid is two ticks away from the best offer and, therefore, no executable trades are present. For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid. FIGURE 2b shows that same hypothetical order book after a series of orders have been entered, namely an iceberg buy order that has been placed to buy 20 contracts, but only shows two (2) contracts to the market at a time. Then, one spoof order is placed on the opposite side of the market for 100 contracts at the first offer level. Following these spoof orders, the order book shows a significant imbalance, giving the appearance of more sellers in the market than buyers, which signals artificial supply to market participants and leads to artificial, downward price pressure.

| Price / Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| | | Order Book Before the Spoofing Begins | | |
| 106.5 | | | 12 | 20 |
| 106 | | | 10 | 50 |
| 105.5 | | | 15 | 25 |
| 105 | | | 8 | 30 |
| 104.5 | | | 6 | 20 |
| 104 | | | 11 | 100 |
| 103.5 | | | 8 | 50 |
| 103 | | | 3 | 20 |
| 102.5 | | | 5 | 25 |
| 102 | | | 6 | 30 |
| | | | | |
| 101 | 6 | 50 | | |
| 100.5 | 10 | 20 | | |
| 100 | 14 | 100 | | |
| 99.5 | 8 | 25 | | |
| 99 | 6 | 25 | | |
| 98.5 | 12 | 30 | | |
| 98 | 4 | 50 | | |
| 97.5 | 7 | 40 | | |
| 97 | 5 | 20 | | |
| 96.5 | 7 | 15 | | |
| TOTAL: | 79 | 375 | 84 | 370 |

**FIGURE 2a.**



Order Book After the Spoofing

| Price / Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 106.5 | | | 12 | 20 |
| 106 | | | 10 | 50 |
| 105.5 | | | 15 | 25 |
| 105 | | | 8 | 30 |
| 104.5 | | | 6 | 20 |
| 104 | | | 11 | 100 |
| 103.5 | | | 8 | 50 |
| 103 | | | 3 | 20 |
| 102.5 | | | 5 | 25 |
| 102 | | | 6̶ 7 | 3̶0̶ 130 |
| 101 | 6̶ 7 | 5̶0̶ 52 | | |
| 100.5 | 10 | 20 | | |
| 100 | 14 | 100 | | |
| 99.5 | 8 | 25 | | |
| 99 | 6 | 25 | | |
| 98.5 | 12 | 30 | | |
| 98 | 4 | 50 | | |
| 97.5 | 7 | 40 | | |
| 97 | 5 | 20 | | |
| 96.5 | 7 | 15 | | |
| TOTAL: | 80 | 377 | 85 | 470 |

A spoof order to sell 100 contracts is placed at the first offer level.

A primary order to buy 20 contracts is placed as an iceberg order. Because this is an iceberg order, the market only sees 1 new order for 2 contracts, reducing any upward price pressure that might partially counteract the spoof orders.

**FIGURE 2b.**

52.     The same technique can also be used in reverse to manipulate prices artificially higher. For example, a trader can place an order to sell Treasury Futures contracts at well above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of the trader's initial sell order.

53.     In each instance, the trader profits because spoofing allows the trader to buy Treasury Futures contracts below the current market price or to sell Treasury Futures contracts above the current market price. The CFTC has described spoofing as "a particularly pernicious example of bad

actors seeking to manipulate the market through the abuse of technology."[11]  James McDonald, the CFTC's former Director of Enforcement, remarked that:

> The advent of the electronic order book brought with it significant benefits to our markets—it increased information available, reduced friction in trading, and significantly enhanced the price discovery process.  But at the same time, this technological development has presented new opportunities for bad actors.  Just as the electronic order book increases information available to traders, it creates the possibility that false information injected into the order book could trick them into trading to benefit a bad actor.[12]

54.    Traders engaged in spoofing gain an unfair and unlawful advantage over other market participants, hindering competition, undermining market integrity, and harming law-abiding victims. As alleged here, Defendants' use of spoofing and other manipulative conduct harmed Plaintiffs and the Class members who purchased or sold Treasury Futures at artificial prices during the Class Period.

## II.    Evidence of Defendants' Misconduct

### A.    Overview of Government Settlements

55.    On December 21, 2020, NatWest Markets entered into the Plea Agreement with the DOJ and USAO-CT to resolve criminal charges that they defrauded other market participants by way of a consistent pattern of manipulative conduct, including at least hundreds of episodes of spoofing the Treasury Futures markets and the secondary cash market for U.S. Treasury notes and bonds.

56.    Pursuant to the terms of the Plea Agreement, NatWest Markets paid approximately $35 million in criminal monetary penalties, criminal disgorgement, and restitution.[13]

57.    In the Plea Agreement, Defendants admitted that during the Class Period, Defendants and their employees:

---

[11] *See* Press Release, *Statement of CFTC Director of Enforcement James McDonald*, CFTC (January 29, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918.

[12] *See* Press Release, *Statement of CFTC Director of Enforcement James McDonald*, CFTC (Nov. 14, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/opamcdonald1.

[13] Plea Agreement at ¶ 20.

knowingly, willfully, and with the intent to defraud placed orders to buy and sell certain U.S. Treasuries with the intent to cancel those orders before execution ("Spoof Orders"), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for U.S. Treasuries.[14]

58.     Pursuant to the Plea Agreement, Defendant NatWest Markets also "admit[ted], agree[d], and stipulate[d] that it is responsible for the acts of its officers, employees, and agents described in the Information, and [the Statement of Facts]."[15]

59.     Defendant NatWest Markets also expressly agreed that it "shall not, through present or future attorneys, officers, directors, employees, [or] agents . . . make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by [NatWest Markets]."[16]

**B.     NatWest is an Active Participant in the U.S. Treasuries Market**

60.     Defendant NMSI, NatWest's FCM, ranks among the world's largest FCMs.[17]

61.     NatWest actively trades interest rate derivatives, including, but not limited to Treasury Futures and Treasury Securities.  For example, as of December 31, 2014, NatWest (then called The Royal Bank of Scotland Group Plc) had approximately $42 billion of notional value in interest rate derivates contracts outstanding and $932 million of notional value in equity and bond futures contracts. Treasury Futures were among the instruments included in these figures. Also as of December 31, 2014, NatWest also held approximately $2.95 billion in U.S. Treasury bills and other debt securities.

---

[14] Plea SOF, at A-3 ¶ 9; *see also* Plea Agreement ¶ 14.

[15] Plea Agreement ¶ 14.

[16] Plea Agreement at ¶ 32.

[17] Based on CFTC data, NMSI ranked as one of the thirty largest FCM as of December 31, 2018.  *See 2019 Top FCMs*, ManagedFuturesInvesting.com (Feb. 19, 2019), *available at*: https://www.managed futuresinvesting.com/2019-top-fcms/.

62.     Defendants' Treasuries Futures traders included at least Connecticut-based Trader-2 and London-based Trader-1.[18]

63.     NatWest also employed other supervisors, salespersons, and traders involved with trading Treasury Futures across its New York, London, and Singapore offices.[19]

### C.     Defendants' Manipulation of Treasury Futures

64.     From approximately January 1, 2008 until, at the earliest, May 31, 2014, NatWest and its U.S. Treasuries traders manipulated the prices of Treasury Futures to illegally increase their trading profits, at the expense of Plaintiffs and the Class.

65.     On at least hundreds of occasions, NatWest knowingly and intentionally placed orders to buy and sell Treasury Futures with the intent to cancel those orders before execution.

66.     Defendants placed Spoof Orders to cause artificial Treasury Futures prices and move prices in a direction that did not accurately reflect market-based forces of supply and demand.

67.     By placing Spoof Orders to *buy* Treasury Futures, NatWest intended to falsely signal to the market that there was increased demand, thus artificially driving up the prices of those products.

68.     Conversely, by placing Spoof Orders to *sell* Treasury Futures, NatWest intended to falsely signal to the market that there was an increased supply, thus artificially driving down the prices of those products.

69.     Market participants traded in a market that appeared, and they believed, to be subject to a legitimate change in supply or demand.  As a result, Defendants' manipulation caused market participants to enter sell orders below, or buy orders above, a competitive market price.

70.     Defendants' manipulation was disclosed for the first time in the DOJ Press Release on December 21, 2020 announcing the DOJ's guilty plea with NatWest.

---

[18] Plea SOF, at A-3 ¶ 7.

[19] Plea SOF, at A-5 ¶ 20.

71.     During the Class Period, NatWest's manipulation caused millions of dollars in losses to market participants in the markets for Treasury Futures.[20]

72.     Defendants' employees referenced their deceptive trading practices in electronic chats with other colleagues at NatWest. For example, Trader-1 would complain when his spoof orders were inadvertently filled against his wishes before he could cancel them. Specifically,, in a chat on June 13, 2011, he explained to a colleague that, in order to execute a Genuine Order to sell, he had placed a buy order (a "bid") into the market. The colleague asked, "why you try and bid? to spoof?" Trader-1 answered: "y[es] . . . i was doing lot of that last week & was saying myself, gonna get caught soon, should stop."

73.     In a chat two weeks later, on June 29, 2011, Trader-1 mentioned to the same colleague that he had been "cau[ght] spoofing few times," and in a chat on August 15, 2012, he complained that he had "dropped little $ alraedy this am spoofing."

74.     The Information and Plea Agreement also include representative examples of Defendants' manipulative trading. Notably, NatWest has admitted to at least hundreds of episodes of spoofing, including each of these examples of manipulative trading and the accompanying details.[21]

75.     Specific examples include the following:

### 1.     July 25, 2012 – Ultrabond T-Bond Futures

76.     On July 25, 2012, Trader-2, while employed at NatWest, placed a Genuine Order to buy 10 Ultrabond futures contracts at $175.90625. Then, Trader-2 placed a Spoof Order to sell 500 Ultrabond futures contracts at $175.93750. Trader-2's spoof order created the illusion of supply for Ultrabond futures, which deceived other market participants and artificially move the market price lower. Shortly after placing the spoof order, Trader-2's Genuine Order to buy was filled in its entirety.

[20] Plea SOF, at A-9 – A-10 ¶ 35.

[21] Plea Agreement ¶ 14.

Having successfully manipulated the price of Ultrabond futures in NatWest's favor, Trader-2 canceled his Spoof Order in its entirety.

### 2. June 24, 2013 – 10-Year T-Note Futures

77. On June 24, 2013, Trader-1, while employed at NatWest, placed an iceberg Genuine Order to buy 100 10-year U.S. Treasury note futures contracts at $125.40625, displaying two contracts to the market. Then, Trader-1 placed a Spoof Order to sell 1,000 10-year U.S. Treasury note futures contracts at $125.421875. Trader-1's Spoof Order created the illusion of supply for 10-year U.S. Treasury note futures, which deceived other market participants and artificially move the market price lower. Shortly after placing the Spoof Order, Trader-1's Genuine Order to buy was filled in its entirety. Having successfully manipulated the price of 10-year U.S. Treasury note futures in NatWest's favor, Trader-1 cancelled his Spoof Order in its entirety.

### 3. May 14, 2014 – Ultrabond T-Bond Futures & 30-Year Treasury Bonds

78. On May 14, 2014, Trader-2 placed a Spoof Order to buy 210 Ultrabond futures contracts at $149.59375. Trader-2's Spoof Order was placed with the intent to create the illusion of demand in the futures market, in order to deceive other market participants, and artificially move the cash market price of U.S. Treasury bonds higher. Shortly after placing the Spoof Order, Trader-2 filled Genuine Orders to sell a total of 2,000,000 30-year U.S. Treasury bonds. Having successfully manipulated the price of U.S. Treasury bonds futures in NatWest's favor, Trader-2 canceled the Spoof Order in its entirety.

79. In each of the above representative examples NatWest manipulated the Treasury Futures market to illegally increase their trading profits, at the expense of Plaintiffs and the Class.

80. Defendants manipulated Treasury Futures' prices throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold at artificially inflated or deflated prices.

81.     Plaintiffs traded Treasury Futures throughout the Class Period at the artificial prices caused by Defendants' manipulation.

**D.     Defendants Failed to Supervise Their Treasuries Futures Traders**

82.     NatWest's compliance program failed to detect or stop NatWest's traders' manipulative trading throughout the Class Period.

83.     Even after supervisors on the U.S. Treasuries desk learned of spoofing misconduct, they helped the traders involved to conceal their conduct from compliance staff.[22]

## CLASS ACTION ALLEGATIONS

84.     Plaintiffs brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.  The "Class" is defined as:

> All persons or entities who transacted in Treasury Futures or Options on Treasury Futures traded on the Chicago Board of Trade from January 1, 2008 through May 31, 2014 (the "Class Period").

85.     Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf.  Also excluded from the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

86.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  There are at least hundreds of individuals or entities that purchased, sold, or held relevant Treasury Futures and options on Treasury Futures during the Class Period at prices

---

[22] Plea SOF, at A-8 – A-9 ¶¶ 28-31.

artificially impacted by Defendants' wrongful conduct. While the exact number and identity of Class members is unknown to Plaintiffs, this can be ascertained from readily available information.

87.     Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein. No conflict between Plaintiffs and the Class members exists.

88.     Plaintiffs will fairly and adequately protect the Class's interests. Plaintiffs are represented by sophisticated, competent class action counsel, experienced in litigating complex class action litigation involving claims arising under the CEA. Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

89.     The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Questions of law and fact common to all Class members, include, but are not limited to:

a.      whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated Treasury Futures prices;

b.      the nature and duration of Defendants' manipulation of Treasury Futures prices;

c.      whether Defendants' conduct violated Section 22 of the CEA;

d.      whether Defendants fraudulently concealed their misconduct from Plaintiffs and the Class; and

e.      the appropriate class-wide measure of relief for Defendants' CEA violations.

90.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

91.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

92.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

93.     During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion and manipulation of the Treasury Futures market.

94.     Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy or sell Treasury Futures at a certain price, even though they secretly had no intent of transacting at that level. Never did Defendants disclose that they placed these orders to manipulate the prices of those instruments.  Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiffs and the Class could not have discovered Defendants' manipulation any earlier than the date of the public disclosures thereof.

95.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due

diligence on or before December 21, 2021, when the DOJ announced that NatWest Markets had entered a guilty plea related to the same misconduct alleged here.

96. As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiffs assert the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiffs and the Class.

97. Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**FIRST CLAIM FOR RELIEF**
**Manipulation of Treasury Futures**
**in Violation of the Commodity Exchange Act**
**(7 U.S.C. § 1, *et seq.* and Regulation 180.2)**
**(Against All Defendants)**

98. Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

99. During the Class Period Defendants intended to and did cause unlawful and artificial prices of Treasury Futures in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of manipulative buy and sell orders and other manipulative conduct.

100. Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of a registered entity, in violation of the CEA.

101. During the Class Period, Treasury Futures' prices did not result from legitimate market information and the forces of supply and demand. Instead, Treasury Futures' prices were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

102. Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution. Defendants intended to inject false information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions.

As a result of these artificial prices, Plaintiffs and the Class suffered losses on their trades in Treasury Futures.

103. Defendants manipulated Treasury Futures' prices throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold at artificially inflated or deflated prices.

104. Defendants had the ability to cause and did cause artificial prices of Treasury Futures. Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for Treasury Futures and were aware of the effects of spoofing and other manipulative trading activities on those markets.

105. By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

106. As a result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures, to which Plaintiffs and the Class would not have been subject but for Defendants' unlawful conduct.

107. Plaintiffs and the Class are each entitled to actual damages sustained in Treasury Futures for the CEA violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**For Employing a Manipulative and Deceptive Device In**
**Violation of The Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a))**
**(Against All Defendants)**

108. Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

109. Defendants' unlawful conduct, including the use of submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for Treasury Futures, constitutes the employment of a manipulative and deceptive device.

110. Defendants acted intentionally—and, even if they are found to not have acted intentionally, then at least acted recklessly—in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiffs and the Class. The risk that Defendants' spoof orders and other manipulative trading activities could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Defendants' spoof orders and other manipulative trading activities were so obvious that Defendants must have been aware of it.

111. Defendants knew that their spoof orders would appear in the order book and that traders often consider order book information in making trading decisions; thus, Defendants were, at least, reckless with respect to the danger that their spoof orders would mislead other market participants.

112. Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

113. As a result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures contracts and options on those futures contracts, to which Plaintiffs and the Class would not have been subject but for Defendants' unlawful conduct.

114. Plaintiffs and the Class are each entitled to damages for the CEA violations alleged herein.

## THIRD CLAIM FOR RELIEF
### Vicarious Liability in Violation of the
### Commodity Exchange Act, As Amended
### (7 U.S.C. §§ 1, *et seq.*)
### (Against All Defendants)

115. Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

116.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

117.     Plaintiffs and the Class are each entitled to damages for the CEA violations alleged herein.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

118.     Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

119.     Defendants financially benefited from their unlawful acts.   As alleged herein, Defendants submitted spoof orders to the CBOT via CME Globex and employed other techniques to manipulate the prices of Treasury Futures in an artificial direction.   Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at Plaintiffs' and the Class' expense.

120.     It would be inequitable for Defendants to be allowed to retain the benefits which Defendants obtained from their illegal manipulative acts and other unlawful conduct at Plaintiffs' and the Class' expense.

121.     Plaintiffs and the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

122.     In addition, each Defendant should pay restitution for its own unjust enrichment to Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiffs as the Class representatives and their Counsel as Class Counsel;

(B)     For a judgment awarding Plaintiffs and the Class actual and punitive damages for Defendants' CEA violations, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)     For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(D)     For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues.

Dated: December 22, 2021

CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP

/s/ *Anthony F. Fata*
Anthony F. Fata
Alexander J. Sweatman
150 S. Wacker, Suite 3000
Chicago, IL 60606
Tel.: (312) 782-4882
E-mail: afata@caffertyclobes.com
asweatman@caffertyclobes.com

*Counsel for Plaintiff Rock Capital Markets LLC and
the Proposed Class*

LOWEY DANNENBERG, P.C.

/s/ *Vincent Briganti*
Vincent Briganti (*pro hac vice* forthcoming)
Raymond P. Girnys (*pro hac vice* forthcoming)
Johnathan P. Seredynski (*pro hac vice* forthcoming)
Peter Demato (*pro hac vice* forthcoming)
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Email: vbriganti@lowey.com
rgirnys@lowey.com
jseredynski@lowey.com
pdemato@lowey.com

*Counsel for Plaintiff Synova Asset Management LLC
and the Proposed Class*