**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| IN RE NATWEST TREASURY FUTURES SPOOFING LITIGATION | Civil Action No. 1:21-cv-06816 <br><br> Honorable John F. Kness <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MOTION TO DISMISS AND
<u>MEMORANDUM OF LAW IN SUPPORT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...............................................................................................................3

LEGAL STANDARDS .....................................................................................................4

ARGUMENT .....................................................................................................................5

I.      PLAINTIFFS LACK ARTICLE III STANDING ................................................5

II.     PLAINTIFFS FAIL TO PLEAD ACTUAL DAMAGES ...................................10

III.    THERE IS NO CEA PRIVATE RIGHT OF ACTION FOR SPOOFING.......................12

IV.    PLAINTIFFS CANNOT STATE A CEA MANIPULATIVE DEVICE CLAIM FOR CONDUCT THAT OCCURRED BEFORE AUGUST 15, 2011 ....................................15

V.     PLAINTIFFS FAIL TO PLEAD PRINCIPAL-AGENT LIABILITY ............................15

VI.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT .................16

VII.   PLAINTIFFS PLEAD NO FACTS CONCERNING MUCH OF THE CLASS PERIOD ....................................................................................................................17

VIII.  THE VAST MAJORITY OF PLAINTIFFS' CLAIMS ARE UNTIMELY ....................18

IX.    PLAINTIFFS FAIL TO ESTABLISH PERSONAL JURISDICTION OVER NATWEST GROUP PLC.............................................................................................................20

CONCLUSION.................................................................................................................21

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................5

*Benson v. Fannie May Confections Brands, Inc.*,
   944 F.3d 639 (7th Cir. 2019) ................................................................................16

*Braman v. CME Group, Inc.*,
   149 F. Supp. 3d 874 (N.D. Ill. 2015) ............................................................. *passim*

*Cancer Foundation, Inc. v. Cerberus Capital Management, L.P.*,
   559 F.3d 671 (7th Cir. 2009) ................................................................................18

*Center for Dermatology & Skin Cancer, Ltd. v. Burwell*,
   770 F.3d 586 (7th Cir. 2014) ..................................................................................4

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011) ..........................................................................16, 17

*Commodity Futures Trading Commission v. My Big Coin Pay, Inc.*,
   334 F. Supp. 3d 492 (D. Mass. 2018) .....................................................................9

*Diedrich v. Ocwen Loan Servicing, LLC*,
   839 F.3d 583 (7th Cir. 2016) ..................................................................................5

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ..............................................................................................20

*Harry v. Total Gas & Power North America, Inc.*,
   244 F. Supp. 3d 402 (S.D.N.Y. 2017), *aff'd*, 889 F.3d 104 (2d Cir. 2018) .....11, 15

*Harry v. Total Gas & Power North America, Inc.*,
   889 F.3d 104 (2d Cir. 2018) ...........................................................................10, 11

*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*,
   545 N.E.2d 672 (Ill. 1989) .............................................................................16, 17

*HTG Capital Partners, LLC v. Doe*,
   2016 WL 612861 (N.D. Ill. Feb. 16, 2016) ..........................................................19

*In re Amaranth Natural Gas Commodities Litigation*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013) ...........17

*In re CBOE Volatility Index Manipulation Antitrust Litigation*,
435 F. Supp. 3d 845 (N.D. Ill. 2020) ...................................................................5

*In re Commodity Exchange, Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016)...............................................................15

*In re ConAgra Peanut Butter Products Liability Litigation*,
2008 WL 2132233 (N.D. Ga. May 21, 2008) ...................................................16

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*,
801 F.3d 758 (7th Cir. 2015) ...........................................................................16

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 463-72 (S.D.N.Y.
2017) ...................................................................................................................18

*In re London Silver Fixing, Ltd.*, *Antitrust Litigation*,
213 F. Supp. 3d 530 (S.D.N.Y. 2016)...............................................................15

*In re London Silver Fixing, Ltd., Antitrust Litigation*,
332 F. Supp. 3d 885 (S.D.N.Y. 2018).............................................................7, 11

*In re Merrill, Bofa, & Morgan Stanley Spoofing Litigation*,
2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ........................................... *passim*

*In re MF Global Holdings Ltd. Investment Litigation*,
998 F. Supp. 2d 157 (S.D.N.Y. 2014), *aff'd sub nom. In re MF Global Holdings Ltd.
Investment Litigation (DeAngelis v. Corzine)*, 611 F. App'x 34 (2d Cir. 2015) ....................12

*In re Platinum & Palladium Antitrust Litigation*,
449 F. Supp. 3d 290 (S.D.N.Y. 2020)...........................................................14, 15

*In re Platinum & Palladium Antitrust Litigation*,
2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017), *on reconsideration*, 449 F. Supp. 3d 290
(S.D.N.Y. 2020) .................................................................................................14

*In re Rough Rice Commodity Litigation*,
2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ......................................................15

*Independent Trust Corp. v. Fidelity National Title Insurance Co. of N.Y.*,
577 F. Supp. 2d 1023 (N.D. Ill. 2008) ............................................................17

*J.S.T. Corp. v. Foxconn Interconnect Technology Ltd.*,
965 F.3d 571 (7th Cir. 2020) .........................................................................5, 20

*Kipp v. Ski Enterprise Corp. of Wisconsin, Inc.*,
783 F.3d 695 (7th Cir. 2015) .............................................................................20

*Klein & Co. Futures v. Board of Trade of New York*,
    464 F.3d 255 (2d Cir. 2006)........................................................................................14

*Loveman v. Lauder*,
    484 F. Supp. 2d 259 (S.D.N.Y.2007)..........................................................................9

*Mashallah, Inc. v. West Bend Mutual Insurance Co*.,
    20 F.4th 311 (7th Cir. 2021) ......................................................................................16

*Menzies v. Seyfarth Shaw LLP*,
    943 F.3d 328 (7th Cir. 2019) ......................................................................................5

*NBA Props., Inc. v. Partnerships & Unincorporated Ass'ns Identified in Schedule*
    *"A"*, 549 F. Supp. 3d 790 (N.D. Ill. 2021) ..............................................................20

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co*.,
    484 U.S. 97 (1987)....................................................................................................13

*Rogers v. City of Hobart, Indiana*,
    996 F.3d 812 (7th Cir. 2021) ..........................................................................5, 20, 21

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015) ......................................................................9

*Silha v. ACT, Inc*.,
    807 F.3d 169 (7th Cir. 2015) ......................................................................................5

*Spicer v. CBOE, Inc*.,
    977 F.2d 255 (7th Cir. 1992) ....................................................................................14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)....................................................................................................5

*Tomlinson v. Goldman, Sachs & Co.*,
    682 F. Supp. 2d 845 (N.D. Ill. 2009), *aff'd sub nom. Premium Plus Partners,*
    *L.P. v. Goldman, Sachs & Co*., 648 F.3d 533 (7th Cir. 2011)................................18

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)............................................................................................5, 6

*Whitesides v. E\*TRADE Securities, LLC*,
    2021 WL 930794 (N.D. Cal. Mar. 11, 2021)..............................................................9

**Docketed Cases**

*In re Deutsche Bank Spoofing Litigation*, No. 1:20-cv-03638 (N.D. Ill.) ......................9

*United States v. NatWest Markets Plc*, No. 3:21-cr-00187 (D. Conn.) ................................. *passim*

**Statutes, Codes & Regulations**

7 U.S.C.
    § 2(a)(1)(B) ...........................................................................................................15
    § 6c ........................................................................................................................13
    § 6c(a)(5)(C) ...............................................................................................3, 13, 14
    § 9 ..........................................................................................................................13
    § 9(1) .............................................................................................................13, 15
    § 25(a)(1) ...............................................................................................................10
    § 25(a)(1)(D)(i) .....................................................................................................13
    § 25(a)(2) ...............................................................................................................13
    § 25(c) ...................................................................................................................18

735 Ill. Comp. Stat. Ann. 5/13-205 ............................................................................18

CFTC Regulation 180.1(a) ..........................................................................................15

Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub. L. No. 111-203,
    124 Stat. 1376 (2010) ...........................................................................................13

**Rules**

Fed. R. Civ. P.
    9(b) ....................................................................................................................5, 11
    12(b)(1) ...................................................................................................................1
    12(b)(2) ...................................................................................................................1
    12(b)(6) ................................................................................................................1, 5
    12(h)(3) ...................................................................................................................4

Fed. R. Evid. 201(b) .....................................................................................................9

**Other Authorities**

Antidisruptive Practices Authority, 78 Fed. Reg. 31,890 (May 28, 2013) ...................13

CME Group, *The Basics of U.S. Treasury Futures* (Jan. 24, 2019),
    https://www.cmegroup.com/ trading/interest-rates/basics-of-us-treasury-futures.html ...........8

NatWest Markets Pleads Guilty to Fraud in U.S. Treasury Markets," DOJ (Dec. 21, 2021),
    https://www.justice.gov/opa/pr/natwest-markets-pleads-guilty-fraud-us-treasury-markets ......4

Defendants NatWest Markets Securities Inc., NatWest Markets Plc, and NatWest Group plc (collectively, "Defendants") respectfully submit this motion and memorandum of law in support of the motion to (1) dismiss the Consolidated Class Action Complaint (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim and (2) dismiss the Complaint as to NatWest Group plc pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

## PRELIMINARY STATEMENT

In a December 2021 plea agreement, following a three-year investigation by the U.S. Department of Justice ("DOJ"), NatWest Markets Plc admitted to certain unlawful trading in the market for U.S. Treasury ("UST") futures between January 2008 and May 2014 and, separately, in the market for UST cash securities during a three-month period in 2018. NatWest Markets Plc agreed to pay more than $6.7 million to compensate affected market participants. The next day, Plaintiffs filed multiple class action lawsuits seeking monetary damages on behalf of a proposed class of all those who traded UST futures and options at any time between 2008 and 2018. Plaintiffs' Complaint, which asserts three claims under the Commodity Exchange Act ("CEA") and a fourth claim for unjust enrichment, amply illustrates why a government investigation, even one that concludes with a guilty plea, is not necessarily a proper basis for a private civil action. Indeed, the Complaint suffers from multiple fatal defects, including the following:

- <u>Plaintiffs fail to demonstrate Article III standing.</u> To satisfy the bedrock requirement of constitutional standing, Plaintiffs must allege that they, rather than other participants in the market for UST futures and options, suffered an injury-in-fact caused by Defendants' conduct. Instead, Plaintiffs strategically omit key details of their own trading and invite the Court to speculate that they were injured. The Court may not.

- <u>Plaintiffs lack statutory standing</u>.  For the same reason they lack constitutional standing, Plaintiffs fail to surmount the more demanding requirement to demonstrate statutory standing to sue under the CEA, which requires Plaintiffs to allege plausibly that they have suffered "actual damages."

- <u>Plaintiffs fail to state a CEA claim</u>.  Plaintiffs' CEA claims suffer from other pleading defects.  First, Plaintiffs attempt to recover based on a form of market conduct called "spoofing," but the CEA provides no private right of action for such conduct.  Second, Plaintiffs attempt to recover based on alleged use of a "manipulative device" starting in 2008, but no such recovery is available for pre-2011 conduct.  And third, Plaintiffs' claim asserting principal-agent liability fails because there is no underlying CEA violation.

- <u>Plaintiffs fail to state a claim for unjust enrichment</u>.  The Complaint contains no plausible facts showing that Defendants were enriched at Plaintiffs' expense.

- <u>Plaintiffs plead no facts concerning four years of their proposed eleven-year class period</u>. The Complaint is based upon admissions by NatWest Markets Plc concerning two separate and unrelated instances of spoofing that occurred four years apart.  Plaintiffs allege no facts concerning any misconduct between 2014 and 2018.  To the extent Plaintiffs' claims are based on that interim period, they must be dismissed.

- <u>Plaintiffs' claims are untimely</u>.  The vast majority of Plaintiffs' claims should be dismissed as time-barred under the relevant statutes of limitation.

- <u>Plaintiffs fail to plead personal jurisdiction</u>.  Plaintiffs fail to plead a basis for this Court to exercise general or specific personal jurisdiction over NatWest Group plc.

For all of these reasons, and as set forth in detail below, the Complaint should be dismissed with prejudice and without leave to replead.

2

## BACKGROUND

Orders for UST futures contracts are placed electronically on a public "order book" that is visible to other market participants. *See* ECF No. 42 ("Compl.") ¶¶ 50-51. When the prices of buy and sell orders match, a transaction is executed. *See id*. ¶ 55. The term "spoofing" describes an unlawful trading practice in which a trader places a bid or offer on the order book "with the intent to cancel the bid or offer before execution." 7 U.S.C. § 6c(a)(5)(C). A "spoof order" may create a false impression of supply or demand and cause other market participants to react, moving prices in a manner that is favorable to a smaller, "genuine order" that the spoofer has placed on the opposite side of the market. Compl. ¶ 69. The spoofer typically cancels the spoof order after the genuine order has been executed. *See id.*

On December 21, 2021, NatWest Markets Plc entered into a plea agreement (the "Plea Agreement") in which it admitted one count each of wire fraud and securities fraud based on spoofing by two traders in the market for UST futures and two traders in the market for UST securities. *See* Compl. ¶ 2; *see* Plea Agreement, *United States v. NatWest Markets Plc*, No. 3:21-cr-00187 (D. Conn. Dec. 21, 2021), ECF No. 9. NatWest Markets Plc did not admit a violation of the CEA. The Plea Agreement identified two separate and distinct instances of spoofing. First, "[b]etween approximately January 2008 and May 2014," a trader in London and a trader in Connecticut "independently engaged" in spoofing in the market for UST futures contracts. Plea Agreement Statement of Facts ("SOF"), A-3, ¶ 7. Second, and "[s]eparately," "for approximately three months in 2018," two traders in Singapore engaged in spoofing in the cash market for UST Securities. *Id.* ¶ 8. NatWest Markets Plc agreed to pay a fine of $25,200,000, criminal forfeiture of $2,841,368, and restitution in the amount of $6,761,967 "to compensate affected market participants for their losses." Plea Agreement ¶ 20(b). A press release instructed affected market participants to visit the DOJ website and submit a claim for

restitution.  *See* "NatWest Markets Pleads Guilty to Fraud in U.S. Treasury Markets," DOJ (Dec. 21, 2021), https://www.justice.gov/opa/pr/natwest-markets-pleads-guilty-fraud-us-treasury-markets.  The Complaint does not allege that Plaintiffs applied to receive compensation from the fund established by DOJ for this purpose.

One day after the Plea Agreement was announced, Plaintiffs filed multiple class action lawsuits seeking to recover damages from Defendants.  ECF No. 18 at 2-3.  Specifically, on December 22, 2021, Plaintiffs Rock Capital Markets LLC, Synova Asset Management LLC, M&N Trading LLC, Kohl Trading LLC, and Port 22 LLC commenced separate class actions, followed by another class action filed by Plaintiff Robert Charles Class A, L.P. on January 27, 2022.  On May 9, 2022, Plaintiffs filed a consolidated amended complaint in which they alleged new facts and added a new plaintiff.  Cribbing from the Plea Agreement, the Complaint identifies three specific episodes of spoofing in the market for UST futures and one episode of spoofing in the cash market for UST notes.  Compl. ¶¶ 96, 98, 101, 103.  The Complaint also alleges that four of the seven Plaintiffs traded in UST futures on days when spoofing in the futures market occurred.  *Id.* ¶¶ 97, 99, 102.  The Complaint does not, however, allege any facts concerning the timing of those Plaintiffs' trading, even though it is impossible to know whether those Plaintiffs could have been harmed by an episode of spoofing without knowing whether they traded during or immediately after the episode.  Concerning any specific trading in UST futures by the other three Plaintiffs, the Complaint alleges no facts at all.

## LEGAL STANDARDS

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).  "[A] plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met."  *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014).

4

Personal jurisdiction can be general or specific. *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 575 (7th Cir. 2020). "General jurisdiction permits a defendant to be sued in a particular forum for any claim, regardless of whether the claim has any connection to the forum state"; specific jurisdiction must be founded on "issues deriving from, or connected with, the very controversy[.]" *Id.* (internal quotation marks omitted). It is Plaintiffs' burden to plead personal jurisdiction. *Rogers v. City of Hobart, Ind.*, 996 F.3d 812, 818 (7th Cir. 2021).

To survive dismissal under Rule 12(b)(6), a complaint must allege sufficient facts to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Any claim that sounds in fraud, including CEA manipulation claims, must also satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b), which requires "precision and some measure of substantiation'"—"the 'who, what, when, where, and how' of the alleged fraud." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019); *see also In re CBOE Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 853 (N.D. Ill. 2020).

## <u>ARGUMENT</u>

## I. PLAINTIFFS LACK ARTICLE III STANDING

To demonstrate Article III standing, Plaintiffs must allege that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Diedrich v. Ocwen Loan Serv., LLC*, 839 F.3d 583, 587-88 (7th Cir. 2016) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "A plaintiff who would have been no better off had the defendant refrained from the unlawful acts of which the plaintiff is complaining does not have standing under Article III of the Constitution to challenge those acts in a suit in federal court." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) (quotation marks omitted); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2206-07 (2021) (Article III does not permit "*unharmed* plaintiffs to sue defendants who

violate federal law").  Plaintiffs, however, have not alleged facts showing that they would have been "better off" absent spoofing by Defendants.  *Silha*, 807 F.3d at 174.  In particular, Plaintiffs have not alleged that they traded at a time when such spoofing would have injured them, rather than having no effect on them, or even benefiting them.  That is fatal.

Plaintiffs' failure of pleading is especially glaring inasmuch as the facts they have omitted from the Complaint are facts concerning the timing of *their own trading*.  Those are facts Plaintiffs could have pled, but chose to omit.  The Complaint includes facts concerning *Defendants'* trading.  Like the Plea Agreement, the Complaint describes several specific examples of spoofing by NatWest Markets Plc.  The Plea Agreement, in its statement of facts, provides exhaustive detail concerning those episodes, including the direction, date, and time of each trade, down to the millisecond.  *See* Plea Agreement SOF ¶¶ 22, 24-26.  The Complaint repeats those facts, except for the specific times.  *See* Compl. ¶¶ 96-103.  Plaintiffs' allegations concerning their *own* trading, on the other hand, are far less detailed.  Concerning three Plaintiffs (Christiansen, Robert Charles Class A, and Synova Asset Management), the Complaint fails even to allege the direction or date of any alleged trading, instead alleging only that those Plaintiffs traded "during the Class Period"—an eleven-year period far exceeding the periods when spoofing occurred per the Plea Agreement.  *Id.* ¶¶ 14, 18, 20.  There is no plausible basis to infer that those Plaintiffs were affected by Defendants' trading, much less that they were harmed.  Those Plaintiffs accordingly lack Article III standing and their claims should be dismissed.

Concerning the remaining four Plaintiffs (Kohl Trading, M&N Trading, Port 22 LLC, and Rock Capital Markets), the Complaint alleges a bit more—but still not enough to demonstrate Article III standing.  Specifically, the Complaint includes allegations that each of these four Plaintiffs bought or sold UST futures contracts on at least one day when spoofing

6

occurred.  Compl. ¶¶ 97, 99, 102.  But the Complaint provides no information about the specific timing of these Plaintiffs' trading—while at the same time omitting the timing of each identified spoofing episode, even though that information appears in the Plea Agreement.  If Plaintiffs had traded at or immediately after the times of the identified spoofing episodes, as any injury would require, Plaintiffs could have alleged those facts—but they chose not to do so.  Plaintiffs' strategic omission of those facts supports an inference that they did *not* trade at or after the time when the spoofing occurred, and thus that they suffered no injury.  Accordingly, these Plaintiffs' claims, too, should be dismissed for lack of standing.

It is especially important for Plaintiffs in this case to allege the timing of their trading because this is a case about spoofing, which has only a fleeting impact on prices.  Plaintiffs contend that the spoofing at issue "had a lasting impact," Compl. ¶ 109, and that prices were "artificial throughout the [ten-year] Class Period," but there are no facts pled in the Complaint to support those conclusory assertions.  Plaintiffs' theory is also at odds with the Plea Agreement upon which they rely.  The Plea Agreement specifies that the purpose of the spoofing at issue was "to generate trading profits and avoid losses."  Plea Agreement SOF ¶ 16.  Plaintiffs do not explain how a spoofer can "generate trading profits" by depressing the price of a futures contract, then purchasing that contract, unless the price of that contract subsequently rebounds.  Indeed, multiple courts have recognized that "[m]anipulative trading strategies like 'spoofing' or triggering stop-loss orders depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief."  *In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021) (dismissing CEA claims with prejudice) *appeal filed* No. 21-853; *see also In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 922 (S.D.N.Y. 2018) (observing, in spoofing case, that

"episodic manipulation does not warp market forces continuously throughout the class period or in a predictable manner" and dismissing CEA claims with prejudice).

Because the effect of spoofing may last "only a matter of seconds," *In re Merrill*, 2021 WL 827190, at *13, a plaintiff claiming to have been injured by spoofing must plead that he or she traded shortly after the spoof occurred. Plaintiffs do no such thing. Instead, they merely claim to have been in the market on three days when identified spoofing events occurred. That is not remotely sufficient to support an inference that Plaintiffs were harmed. To put it in perspective, the combined duration of the spoofing events detailed in the Plea Agreement was approximately three minutes. That represents approximately 0.07 percent of the duration of the three trading days during which Plaintiffs claim to have traded. *See* Plea Agreement SOF ¶¶ 22, 24-25. To infer that Plaintiffs traded during those three minutes, or shortly afterward, rather than at any other time during those three days, would require the Court to engage in rank—and impermissible—speculation.

Nor can Plaintiffs demonstrate standing by claiming to have traded UST futures "thousands" of times, as certain Plaintiffs are alleged to have done. *See* Compl. ¶¶ 14-17, 19. Once again, impermissible speculation would be required to conclude that Plaintiffs' alleged trading overlapped with episodic misconduct in an extraordinarily liquid market. In 2018 alone, UST futures traded on the CBOT in an average daily volume of 4.2 million contracts. *See* CME Group, *The Basics of U.S. Treasury Futures* (Jan. 24, 2019), https://www.cmegroup.com/

trading/interest-rates/basics-of-us-treasury-futures.html.[1]  That means potentially more than *11 billion* trades occurred during the proposed eleven-year class period.  Generalized allegations that Plaintiffs transacted "thousands" of times in such a market do not come close to pleading an injury-in-fact.  *See In re Merrill*, 2021 WL 827190, at *13 ("Over a period of seven years, even thousands of fraudulent spoofs whose effect lasted only a matter of seconds would not necessarily impact specific trades of others.").

Judge Gottschall has warned, in a case involving some of the same Plaintiffs here, that allegations like the ones advanced in this lawsuit might be insufficient to demonstrate Article III standing.  *See In re Deutsche Bank Spoofing Litig.*, No. 1:20-cv-03638 (N.D. Ill. Sept. 20, 2021), ECF No. 49 (attached hereto as Exhibit A).  In that case, the plaintiffs "identif[ied] no trading-related losses they suffered from defendants' alleged spoofing on any particular day."  *Id.* at 9-10.  The plaintiffs instead alleged that they "regularly transacted" in the relevant market.  *Id.* at 2.  Those plaintiffs went further than Plaintiffs here by claiming to have traded "on *every* trading day during the one-year class period."  *Id.* (citing *In re Deutsche Bank* Compl. ¶ 17, ECF No. 40).  As Judge Gottschall explained, however, such "general allegations that the plaintiffs engaged in transactions in the relevant derivative market during the class period" were insufficient to "plead an injury in fact," thereby "rais[ing] legitimate concerns about whether any plaintiffs have alleged enough to demonstrate [Article III] standing."  *Id.* at 9-10.

---

[1]     The Court may take judicial notice of these facts because they are not subject to reasonable dispute but rather "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); *see, e.g.*, *Commodity Futures Trading Comm'n v. My Big Coin Pay, Inc*., 334 F. Supp. 3d 492, 497 n.6 (D. Mass. 2018) (taking judicial notice of facts set forth in CME publication); *see also Whitesides v. E*TRADE Sec., LLC*, 2021 WL 930794, at *7 (N.D. Cal. Mar. 11, 2021) (taking judicial notice of trading volume); *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1253 (C.D. Cal. 2015) (same); *Loveman v. Lauder*, 484 F. Supp. 2d 259, 268 (S.D.N.Y. 2007) (same).

If Plaintiffs had traded at a time when the spoofing could have injured them, *i.e.*, during one of the identified spoofing events or immediately afterward, they could have alleged that. They did not. Their apparent tactical decision to omit the timing of their trading from the Complaint, far from supporting an inference that they were injured, supports the opposite inference: Plaintiffs suffered no injury. As a result, the Court lacks subject matter jurisdiction, and the Complaint should be dismissed.

## II. PLAINTIFFS FAIL TO PLEAD ACTUAL DAMAGES

For the same reason Plaintiffs lack Article III standing, they also fail to satisfy the more demanding requirement to demonstrate "statutory standing" to pursue their claims under the CEA. The CEA recognizes a narrow private right of action that attaches only to those who can show that "the defendant violated the CEA" and that the violation caused him to suffer "actual damages." *Braman v. CME Grp., Inc*., 149 F. Supp. 3d 874, 886 (N.D. Ill. 2015); 7 U.S.C. § 25(a)(1). A CEA plaintiff cannot survive dismissal by parroting the findings of regulators— who need not prove injury—and inviting speculation that he, rather than some other participant in the relevant commodity market, was injured. That makes sense especially where, as here, the DOJ has established a fund to compensate market participants who were actually harmed. Stated differently, "[t]here are no citizens' arrests for commodities fraud, and, in any case, the sheriffs in that particular town are already on the case. Plaintiffs can only recover in a civil action if they can establish that they themselves have been harmed by Defendants' activities." *Harry v. Total Gas & Power N. Am., Inc*., 889 F.3d 104, 109-10 (2d Cir. 2018). Plaintiffs have not done so, requiring dismissal of their claims.

Interpreting the "actual damages" requirement of the CEA, the Second Circuit has explained that "[f]or one trader to have injured another, the former must have taken an action that had an impact on the latter's position and that impact must have been negative." *Total Gas*,

889 F.3d at 112. To be sure, the "plaintiff and defendant need not have been trading simultaneously," but the plaintiff must "plead[] facts indicating that the defendant's actions caused price artificiality during the time in which plaintiff was trading." *Id.* at 111, 113 n.3; *see also Braman*, 149 F. Supp. 3d at 890. For the reasons explained already above, Plaintiffs fail to allege plausibly, let alone with the particularity required by Rule 9(b), that they traded at a time when Defendants' trading could have had a "negative impact" on them. Indeed, as explained, the Complaint alleges no specific trading at all by three Plaintiffs. And although the Complaint alleges futures trading by the remaining four Plaintiffs on days when spoofing events occurred, it does not specify the timing of any such trading. As a result, there is no plausible basis to infer that any Plaintiff was affected, let alone injured, by spoofing.

Courts have consistently rejected CEA claims based on allegations that are similarly deficient. In *Total Gas*, for example, the court held that the plaintiffs lacked statutory standing where, like Plaintiffs here, they failed to allege the details of their own transactions sufficiently to demonstrate actual damages:

> In this case the plaintiffs have access to all the information they need to allege which transactions they engaged in that resulted in economic harm. They have their own trading records, the precise trades that are alleged to have been made in an attempt to manipulate prices at particular regional hubs, and the natural gas futures pricing information over the relevant time period. The plaintiffs' failure to allege a single specific transaction that lost value as a result of the defendants' alleged misconduct precludes a plausible allegation of actual injury.

*Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 416 (S.D.N.Y. 2017), *aff'd*, 889 F.3d 104 (2d Cir. 2018). Similarly, in *Silver Fixing*, the court dismissed CEA claims where the plaintiffs failed to "connect [the defendants'] manipulative conduct to [their own] alleged injury (if they suffered any injury at all)." 332 F. Supp. 3d at 923. Likewise in *Merrill*, the plaintiffs— one of whom is also a Plaintiff in this case—failed to allege that they traded at a time when they

11

could have been affected by the defendants' alleged spoofing, requiring dismissal. The parallels between this case and *Merrill* are striking. There, as here, the plaintiffs strategically omitted the timing of their own trading, supporting an inference that they were not harmed:

> Plaintiffs, moreover, steadfastly avoid pleading that, on the dates there were spoof trades, they traded after the spoof. Given the specificity of the information available to Plaintiffs in terms of the date and time of a trade, the only plausible inference is that they traded before the spoof. If they traded after and proximate to the spoof, there is no reason for them not to have alleged it. And, if their trades all occurred before the spoof, there is no plausible inference that the trade took place at a price that was artificially impacted as a result of the spoof. There also is no basis for an inference that Plaintiffs were harmed as a result of Defendants' alleged manipulation as opposed to having been benefitted. Therefore, Plaintiffs' allegations that their trades occurred on the same days as the spoofs cannot establish, without more, that they suffered harm resulting from the alleged CEA violation.

*In re Merrill*, 2021 WL 827190, at *12. In *Merrill*, the result of these manifest deficiencies was dismissal; the result here should be no different.

## III. THERE IS NO CEA PRIVATE RIGHT OF ACTION FOR SPOOFING

Plaintiffs' CEA claims suffer from another fatal flaw. Although the CEA prohibits spoofing, the narrow private right of action provided in the statute does not itself extend to such conduct. *See Braman*, 149 F. Supp. 3d at 885 ("[A]lthough many of the activities alleged in plaintiffs' complaint violate the CEA—spoofing, wash trading, etc.—the CEA does not create a private right of action for such violations[.]"); *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 175-76 (S.D.N.Y. 2014) (recognizing "Congress's intent to limit 'the circumstances under which a civil litigant could assert a private right of action for a violation of the CEA'"), *aff'd sub nom. In re MF Glob. Holdings Ltd. Inv. Litig. (DeAngelis v. Corzine)*, 611 F. App'x 34 (2d Cir. 2015). Plaintiffs try to avoid this problem by casting their claims of spoofing as "manipulation" or "manipulative device" claims, but the Complaint describes and

repeatedly names the exact activity that Congress determined would not be subject to private enforcement—"spoofing"—and all of Plaintiffs' CEA claims must be dismissed as a result.

In 2011, Congress amended the CEA to prohibit the use or employment of "any manipulative … device" as well as certain "disruptive practices," including the conduct "commonly known to the trade as [] 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)." 7 U.S.C. §§ 6c(a)(5)(C); 9(1); *see* Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub. L. No. 111-203, § 747, 124 Stat. 1376, 1739 (2010). In so doing, Congress distinguished between, and kept separate, two distinct prohibitions—one addressed to "manipulative" practices, which appears in Section 6 of the statute (codified at 7 U.S.C. § 9), and another addressed to "disruptive" practices (such as spoofing), which appears in Section 4 (codified at 7 U.S.C. § 6c); *see* Antidisruptive Practices Authority, 78 Fed. Reg. 31,890, 31,892 (May 28, 2013) (CFTC "interprets the [disruptive practices] prohibitions in CEA section 4c(a)(5) provisions to be distinct statutory provisions from the anti-manipulation provisions in section 753 of the Dodd-Frank Act [Section 6 of the CEA]").

To help enforce its prohibition on the use or employment of a "manipulative device," Congress created a private right of action. *See* 7 U.S.C. § 25(a)(1)(D)(i). But Congress chose not to do likewise in relation to its prohibition on "disruptive practices," like spoofing. That distinction must be respected. *See Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co*., 484 U.S. 97, 106 (1987) (finding it "significant that Congress expressly provided for nationwide service of process" in certain CEA enforcement provisions but not in the relevant section and noting that Congress's silence in that section "argues forcefully that such authorization was not its intention"). The CEA's private right of action sets out "the exclusive remedies" available to a private entity or person. 7 U.S.C. § 25(a)(2); *see Braman*, 149 F. Supp. 3d at 887 ("the only

circumstances in which a private right of action exists"); *see also Klein & Co. Futures v. Bd. of Trade of New York*, 464 F.3d 255, 260 (2d Cir. 2006) (noting the "important limitation[s]" in Section 22 of the CEA). Thus, as another court in this District has recognized, there is no private right of action under the CEA for injuries sustained from the "[d]isruptive practice[]" known as "spoofing." 7 U.S.C. § 6c(a)(5)(C); *Braman*, 149 F. Supp. 3d at 885.

Nor can a private right of action be implied. "[C]ourts may not recognize an implied remedy absent persuasive evidence that Congress intended to create one." *Spicer v. CBOE, Inc*., 977 F.2d 255, 258 (7th Cir. 1992). Here, there is no "persuasive evidence" that Congress intended a private right of action for spoofing. Instead, there is strong evidence that Congress intended the opposite. When the statute was amended in 2010, Congress chose to create a private right of action for use or employment of a "manipulative device," as it had already done for "manipulation." If Congress had intended to create a similar right in relation to "disruptive practices" such as spoofing, it would have done so.

Plaintiffs also cannot recast their spoofing claims as claims for manipulation or use of a manipulative device. *See, e.g*., *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *35 (S.D.N.Y. Mar. 28, 2017) (plaintiffs could not "shoehorn" alleged market manipulation into CEA's prohibition on false reports), *on reconsideration*, 449 F. Supp. 3d 290 (S.D.N.Y. 2020). Plaintiffs' allegations relate only to spoofing. Each Plaintiff is alleged to have been "deprived … of the ability to transact in a lawful market" because "Defendants spoofed the market[.]" Compl. ¶¶ 14-20. The Complaint devotes an entire section to explaining "The Mechanics of Spoofing." *Id*. ¶¶ 68-73. Congress having addressed spoofing and manipulation separately, Plaintiffs cannot collapse the distinction and circumvent legislative intent through

14

imaginative pleading. Because there is no private right of action for spoofing, Plaintiffs' CEA claims should be dismissed.

## IV. PLAINTIFFS CANNOT STATE A CEA MANIPULATIVE DEVICE CLAIM FOR CONDUCT THAT OCCURRED BEFORE AUGUST 15, 2011

Plaintiffs purport to bring a manipulative device claim under 7 U.S.C. § 9(1) and CFTC Regulation 180.1(a) (Count II) for conduct occurring between January 1, 2008 and December 31, 2018. *See* Compl. ¶¶ 1, 154-160. But that statute and rule did not become effective until August 15, 2011. Thus, Plaintiffs' manipulative-device claim must be dismissed to the extent it is based on alleged conduct occurring prior to August 15, 2011. *See In re London Silver Fixing, Ltd.*, *Antitrust Litig.*, 213 F. Supp. 3d 530, 569-70 (S.D.N.Y. 2016) ("[B]ecause Rule 180.1 did not become effective until August 15, 2011, Plaintiffs' manipulative device claim based on pre-August 15, 2011 conduct must be dismissed."); *In re Commodity Exch., Inc*., 213 F. Supp. 3d 631, 672 (S.D.N.Y. 2016) (dismissing manipulative-device claims based on pre-August 15, 2011 conduct).

## V. PLAINTIFFS FAIL TO PLEAD PRINCIPAL-AGENT LIABILITY

Plaintiffs' CEA claim for principal-agent liability (Count III) fails for the further reason that Plaintiffs plead no underlying CEA violation. Title 7 U.S.C. § 2(a)(1)(B), under which Plaintiffs seek relief, requires an "act, omission, or failure" of an agent to establish liability. Thus, "principal-agent liability … claims under the CEA ... are viable only where an underlying primary violation of the CEA can survive a motion to dismiss." *Platinum & Palladium*, 449 F. Supp. 3d 290, 331 n.30 (S.D.N.Y. 2020); *see also Total Gas*, 244 F. Supp. 3d at 417 ("[B]ecause the plaintiffs failed to state a claim under the CEA …, their claims for aiding and abetting and principal-agent liability … also fail."); *In re Rough Rice Commodity Litig*., 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012) (same).

## VI.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT

Plaintiffs' unjust enrichment claim (Count IV) fails for two distinct and independently sufficient reasons.  *First*, courts have explained that "[u]njust enrichment under Illinois law 'does not constitute an independent cause of action.'"  *Mashallah, Inc. v. W. Bend Mut. Ins. Co*., 20 F.4th 311, 324 (7th Cir. 2021); *Benson v. Fannie May Confections Brands, Inc*., 944 F.3d 639, 648 (7th Cir. 2019) ("Under Illinois law, there is no stand-alone claim for unjust enrichment.").[2] Rather, "Illinois courts describe it as 'a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence[.]'"  *Benson*, 944 F.3d at 648.  Thus, where a claim of unjust enrichment "rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and … will stand or fall with the related claim."  *Cleary v. Philip Morris Inc*., 656 F.3d 511, 517 (7th Cir. 2011).  Because Plaintiffs' CEA claim fails, their common-law claim fails, too.  *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig*., 801 F.3d 758, 765 (7th Cir. 2015) (affirming dismissal of unjust enrichment claim where plaintiff "failed to establish any statutory violation").

*Second*, even if Plaintiffs plausibly alleged a statutory violation (which they have not), the unjust enrichment claim should still be dismissed for failure to state a claim.  A plaintiff alleging unjust enrichment "'must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'"  *Cleary*, 656 F.3d at 518 (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc*., 545 N.E.2d 672, 678 (Ill. 1989)).  That is, the

---

[2]    Defendants assume solely for the purpose of this motion that Illinois law governs the unjust enrichment claim.  A "rigorous choice of law analysis" will be required if this claim survives.  *In re ConAgra Peanut Butter Prods. Liab. Litig*., 2008 WL 2132233, at *1 (N.D. Ga. May 21, 2008).

plaintiff "must show a detriment—and, significantly, a connection between the detriment and the defendant's retention of the benefit." *Id*. at 519; *Indep. Tr. Corp. v. Fid. Nat'l Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1051 (N.D. Ill. 2008) (stating that "there must be a causal link between the wrongful conduct and the acquisition by the defendant of the benefit").

The Complaint meets none of these requirements. It makes conclusory allegations that Defendants "deprived [Plaintiffs] and the Class of the ability to transact in a lawful market that was free of manipulation," Compl. ¶¶ 14-20, and implausible suggestions that Plaintiffs' trading on the "same day" as spoofing caused Plaintiffs to "earn fewer profits or suffer greater losses," *id*. ¶¶ 97, 99, 102. It omits, however, "specific factual allegations" that Defendants caused any detriment to Plaintiffs and obtained a resulting benefit. *HPI Health Care Servs*., 545 N.E.2d at 679. There is no "connection" between the detriment Plaintiffs allege they suffered and the benefit they allege Defendants unjustly retained. *Cleary*, 656 F.3d at 519; *cf. In re Amaranth Nat. Gas Commodities Litig*., 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008) (applying New York law to reject unjust enrichment claims where the "alleged link between … defendants' manipulations [and] plaintiffs' trades … is too attenuated"), *aff'd*, 730 F.3d 170 (2d Cir. 2013). Finally, the failure of Plaintiffs' CEA claims undermines any allegation that Defendants' retention of any benefit Defendants supposedly received would be "unjust." *See Braman*, 149 F. Supp. 3d at 897. The unjust enrichment claim should be dismissed as a result.

## VII. PLAINTIFFS PLEAD NO FACTS CONCERNING MUCH OF THE CLASS PERIOD

A further failure of pleading requires dismissal of all of Plaintiffs' claims, to the extent they are based on events between 2014 and 2018—i.e., nearly half of Plaintiffs' proposed class period—as well as the portion of 2018 not covered by the Plea Agreement. The Plea Agreement upon which the Complaint is based describes two discrete and "separate" episodes of

misconduct.  Plea Agreement SOF ¶ 8.  One occurred between January 2008 and May 2014 and involved spoofing by two employees, one located in London and the other in Connecticut, in the UST futures market.  *See id.* ¶ 7.  The other occurred during a three-month period in 2018 and involved unrelated spoofing by two different employees, located in a different office (Singapore), in a different market (the market for UST securities).  *Id.* ¶ 8.  The Complaint pleads no facts concerning alleged misconduct during any other time period.  Instead, Plaintiffs allege, "[u]pon information and belief, based on the nature of the misconduct alleged herein, [that] this pattern and practice of spoofing by NatWest continued through 2018."  Compl. ¶ 105.  That is patently insufficient to state, let alone with particularity, a claim for relief.  To the extent based on such allegations, Plaintiffs' claims must be dismissed.  *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 463-72 (S.D.N.Y. 2017) (dismissing as implausible claims based on conduct during five years of proposed nine-year class period).

## VIII.  THE VAST MAJORITY OF PLAINTIFFS' CLAIMS ARE UNTIMELY

To be timely, a CEA claim must be asserted "not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  "[I]t is the discovery of the injury, not the elements of a particular claim, that gets the clock ticking."  *Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 846 (N.D. Ill. 2009) (quoting *Cancer Found., Inc. v. Cerberus Cap. Mgmt., L.P.*, 559 F.3d 671, 674 (7th Cir. 2009)), *aff'd sub nom. Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533 (7th Cir. 2011).  A cause of action arises, and the limitations period runs, when "plaintiffs know or reasonably should know that they have been injured and that their injuries were wrongfully caused."  *Braman*, 149 F. Supp. 3d at 884.  An Illinois unjust enrichment claim is subject to a five-year statute of limitations that similarly runs from when the plaintiff knew or should have known about his injury.  *See id.* (citing 735 Ill. Comp. Stat. Ann. 5/13-205).

Plaintiffs here knew or should have known about their alleged injuries arising from spoofing in the futures market—*i.e.*, that they transacted in that market at an artificial price in response to a "spoof" order that subsequently was withdrawn—no later than May 2014.  That is because May 2014 is the end of the time period during which the Plea Agreement describes such conduct as having occurred, and also the date of the last such spoofing episode described in the Complaint.  *See* Plea Agreement SOF ¶ 7; Compl. ¶ 101.  For similar reasons, to the extent the Court credits Plaintiffs' assertion that their trading in the futures market was affected by spoofing in the UST securities market, *see* Compl. ¶ 46, Plaintiffs were on notice of *that* alleged injury no later than July 2018, the last date when such spoofing is alleged to have occurred, *see id.* ¶ 103.

To the extent Plaintiffs contend that they could not have identified their supposed injuries by observing the market in which they were trading, there is no support for such a contention. The order book, as the Complaint itself highlights, is not only publicly viewable but closely studied by traders.  *See* Compl. ¶ 157 ("traders often consider order book information in making trading decisions").  Notwithstanding Plaintiffs' contention that UST futures trade "anonymously," Compl. ¶ 111, by analyzing "publicly available data for trading patterns," an investor in the futures market can identify and investigate transactions it conducted at an artificial price due to market manipulation, *HTG Cap. Partners, LLC v. Doe*, 2016 WL 612861, at *1 (N.D. Ill. Feb. 16, 2016).  In *HTG Capital Partners*, for example, the plaintiff did just that, analyzing trading records, isolating trades in which it suspected manipulation, and ultimately suing John Doe defendants as a means of identifying its counterparties and vindicating its rights.

Plaintiffs here exercised no such diligence.  Instead, they waited until December 22, 2021 to sue.  By that time, all of their CEA claims had expired.  Specifically, their claims based on spoofing in the UST futures market, which they could have discovered no later than May 2014,

19

expired two years later in May 2016.  And their claims based on spoofing in the UST securities

market, which they could have discovered no later than July 2018, expired in July 2020.

Plaintiffs' unjust enrichment claims based on spoofing in the UST futures market, meanwhile,

expired five years from the latest date by which they reasonably should have known about their

injuries, *i.e.*, in May 2019.  The only claims asserted by Plaintiffs that conceivably remained

timely when they filed suit in December 2021 were their unjust enrichment claims based on

spoofing in the UST securities market during three months in 2018.  The remainder of Plaintiffs'

claims should be dismissed as untimely.

## IX.    PLAINTIFFS FAIL TO ESTABLISH PERSONAL JURISDICTION OVER NATWEST GROUP PLC

Plaintiffs cannot establish personal jurisdiction over NatWest Group plc.  NatWest Group

plc is not subject to general jurisdiction in Illinois because it lacks contacts that are "so

continuous and systematic as to render [it] essentially at home" in the state.  *J.S.T. Corp.*, 965

F.3d at 575 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919

(2011)).  NatWest Group plc's principal place of business is in the United Kingdom, not in

Illinois.  McCarty Decl. ¶ 4; Compl. ¶¶ 21, 23.  NatWest Group plc maintains no offices in

Illinois, or anywhere else in the United States, and conducts no business in Illinois.  McCarty

Decl. ¶ 5.  Thus, NatWest Group plc is not "at home" in Illinois.  *Kipp v. Ski Enter. Corp. of

Wis., Inc.*, 783 F.3d 695, 698-99 (7th Cir. 2015).

Nor is there any basis to exercise specific jurisdiction over NatWest Group plc, because

NatWest Group plc lacks minimum contacts in Illinois, Plaintiffs' claims do not arise out of any

such contacts, and the exercise of jurisdiction over NatWest Group plc would contravene

traditional notions of fair play and substantial justice.  *See NBA Props., Inc. v. Partnerships &

Unincorporated Ass'ns Identified in Schedule "A"*, 549 F. Supp. 3d 790, 793-94 (N.D. Ill. 2021).

NatWest Group plc has no operations in Illinois or anywhere else in the United States.  McCarty Decl. ¶ 5.  Plaintiffs accordingly cannot show that any alleged conduct of NatWest Group plc "connects [it] with the forum in a meaningful way."  *Rogers*, 996 F.3d at 819.  Indeed, the Complaint alleges *zero* facts concerning any alleged misconduct by NatWest Group plc, let alone conduct that would constitute minimum contacts with the state of Illinois or support jurisdiction in this forum as a matter of "fair play and substantial justice."  *Id.* at 818 (internal quotation marks omitted).  The claims against NatWest Group plc should be dismissed.

## CONCLUSION

For the reasons above, the Court should grant Defendants' motion to dismiss.

Dated:  July 8, 2022

Respectfully submitted,

*/s/ Jamie S. Dycus*
David J. Doyle
Bar No. 6224828
FREEBORN & PETERS LLC
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
Tel.: (312) 360-6824
ddoyle@freeborn.com

Jamie S. Dycus (*pro hac vice*)
Julia Pilcer Lichtenstein (*pro hac vice*)
Marissa W. Medine (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7236
Fax: (212) 230-8888
Email: jamie.dycus@wilmerhale.com

Theresa Titolo (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW

Washington, DC 20006
Tel.: (202) 663-6527
Fax: (202) 663-6363
Email: theresa.titolo@wilmerhale.com

*Counsel for Defendants*