**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATWEST TREASURY FUTURES SPOOFING LITIGATION | No. 21 C 6816<br><br>Judge John F. Kness |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs in this case are traders in the market for Treasury futures, which are contracts to buy or sell government securities at a set price on a specified future date. Plaintiffs allege that Defendants manipulated that market by an illegal practice called spoofing: placing orders with the intent to cancel them before they can be filled. According to Plaintiffs, Defendants' spoofing caused Plaintiffs to pay more to buy, or receive less to sell, Treasury futures than they would have in an unmanipulated market.

Defendants have moved to dismiss the complaint. For the reasons that follow, the Court agrees that the complaint as it presently stands does not adequately allege that any injury Plaintiffs suffered is traceable to Defendants' conduct. Plaintiffs thus lack constitutional standing, and without standing, there is no jurisdiction vested in this Court. As a result, the complaint must be dismissed. But because this dismissal is without prejudice, Plaintiffs are given leave file an amended complaint if they believe an amended pleading can cure this jurisdictional defect.

## I. BACKGROUND

Plaintiffs Henrik Christensen; Kohl Trading LLC; M & N Trading, L.L.C.; Port

22, LLC; Robert Charles Class A, L.P.; Rock Capital Markets, LLC; and Synova Asset Management, LLC, filed a consolidated class-action complaint against Defendants NatWest Markets Securities Inc., NatWest Markets Plc, NatWest Group Plc, and John Doe Nos. 1–20. (Dkt. 42.) Plaintiffs' complaint stems from Defendants' manipulation of markets for commodity futures contracts and commodity-futures option contracts by "spoofing." (*See id.* ¶¶ 2, 4.)

A commodity futures contract is a bilateral agreement to buy and sell a particular commodity at a specified price and time in the future. (*Id.* ¶ 39.) The underlying commodity can be physical (e.g., corn or silver) or a financial instrument (e.g., Treasury securities, foreign currencies, or the value of a stock index). (*Id.*) Many Treasury futures—futures contracts in which the underlying commodity is Treasury securities—are bought and sold through CME Globex, an electronic trading platform. (*Id.* ¶¶ 46–49.) To facilitate a transaction, traders place electronic buy and sell orders in a public "order book," viewable by other market participants. (*See id.* ¶¶ 50–51.) Traders refer to buy orders as "bids" and sell orders as "offers" or "asks." (*Id.* ¶ 50.)

An option contract gives a trader the right (but not the obligation) to buy something from or sell something to the counterparty at a specified price within a specified time. (*Id.* ¶ 42.) The underlying "something" can be Treasury futures. (*Id.*)

"Spoofing" is the unlawful practice of a placing a buy or sell order on the market "with the intent to cancel the bid or offer before execution." 7 U.S.C. § 6c(a)(5)(C). Spoofed orders manipulate market prices by creating false impressions of high demand or supply. (*See* Dkt. 42 ¶ 69.)

For example, a trader seeking to artificially lower a futures price can place a legitimate buy order at a price below the lowest ask price in the market. (*Id.* ¶ 69.) Then the trader spoofs prices lower by placing a large spoof sell order at a price at or above the market's lowest ask price. (*Id.*) The spoof order creates a mistaken market impression of increased supply, influencing other traders to lower their ask prices. (*Id.*) The spoofer cancels the spoof order before it is filled. (*Id.*) Once the artificial price is established in the market, the spoofer's legitimate buy order is executed at the lower, artificial price. (*See id.* ¶ 69.) After the price returns to its higher, unmanipulated level, the spoofer can profit by selling at a price higher than the price at which it bought. (*See id.* ¶ 72.) Spoofing can also work in the opposite direction: manipulators can artificially raise market prices by placing large spoof buy orders at or below the market's highest bid price. (*See id.* ¶ 71.)

On December 21, 2021, Defendant NatWest Markets Plc (NatWest Markets) entered into a federal plea agreement to resolve criminal charges that it defrauded other market participants by manipulative conduct, including spoofing the Treasury futures market hundreds of times. (*Id.* ¶ 74.) NatWest Markets pleaded guilty to one count of wire fraud and one count of securities fraud related to Treasury futures and Treasury securities. (*Id.* ¶ 75.) NatWest Markets admitted that its traders placed spoof orders to manipulate the market prices of Treasury securities between 2008 and 2014 and also in 2018. (*See id.* ¶ 77; Plea Agreement attach. A ¶¶ 7–8, *United States v. NatWest Mkts. Plc*, No. 21-cr-187 (D. Conn. Dec. 21, 2021).)

Plaintiffs' complaint asserts four claims: (1) manipulation of Treasury futures

and options in violation of the Commodity Exchange Act (CEA); (2) employing a manipulative and deceptive device in violation of the CEA; (3) vicarious liability in violation of the CEA; and (4) unjust enrichment. (Dkt. 42 ¶¶ 144–168.) Plaintiffs allege that they were injured because in three instances at least one plaintiff traded on the same day as one of NatWest Markets' spoofs, and the spoofs caused Plaintiffs to pay more to buy or receive less to sell the futures or options than they would have paid or received in an unmanipulated market. (*See id.* ¶¶ 96–102.)

Defendants have moved to dismiss the consolidated complaint under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. (Dkt. 50.) On Rule 12(b)(1) grounds, Defendants argue that Plaintiffs fail to allege Article III standing. Along with other Rule 12(b)(6) arguments, Defendants contend that Plaintiffs fail to plead actual damages as required to state a CEA claim.

## II. LEGAL STANDARDS

A motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a court's subject-matter jurisdiction to hear a case. In deciding a facial challenge to subject-matter jurisdiction—a challenge that the plaintiff has not sufficiently alleged a basis of subject-matter jurisdiction—the court must accept the plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). But the plaintiff "bears the burden of establishing that the jurisdictional requirements have been met." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). A plaintiff carries that burden at the pleading stage by pleading facts that "plausibly give rise to" jurisdiction. *Silha*, 807 F.3d at 174 (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009)). When motions under Rule 12(b)(1) and Rule 12(b)(6) are presented together, a court should consider the Rule 12(b)(1) motion first. *See Bell v. Hood*, 327 U.S. 678, 682 (1946).

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put another way, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (cleaned up).

As the Seventh Circuit has emphasized, a plaintiff need not "lay out every element or ingredient" of a claim to survive a Rule 12(b)(6) motion. *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1336 (7th Cir. 2024). Such "details and proof" come later, and all a plaintiff must do is "state a grievance." *Id.* at 1338. In evaluating a Rule 12(b)(6) motion, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But even though factual allegations are entitled to the assumption of truth, mere legal conclusions are not. *Id.* at 678–79. Finally, the plausibility requirement articulated in *Twombly* and *Iqbal* for surviving a Rule 12(b)(6) motion is the same as

the plausibility requirement for surviving a Rule 12(b)(1) motion. *Silha*, 807 F.3d at 174.

## III. DISCUSSION

### A. Article III Standing

Under the Constitution, the jurisdiction of federal courts is limited to certain "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. To present a justiciable case or controversy at the pleading stage, the complaint must allege facts sufficient to establish that the plaintiff has "standing." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To satisfy the standing requirement, the complaint must allege an injury in fact, a causal connection between the injury and the complained-of conduct, and a likelihood that the injury will be redressed by a favorable decision. *Id.*

An injury in fact is "an invasion of a legally protected interest" that is (a) concrete and particularized (i.e., "the injury must affect the plaintiff in a personal and individual way"); and (b) actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560 & n.1. For there to be a causal connection between the injury and the defendant's alleged conduct, the injury must be fairly traceable to the defendant's conduct, not the result of the independent action of a third party not before the court. *Id.* at 560.

At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" because courts presume that such allegations embrace the specific facts necessary to support the claim. *Id.* at 561. But to support jurisdiction, general factual allegations must have more factual content than "bare and conclusory allegations." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583,

589 (7th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678, 680). Bare and conclusory allegations include "a formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555, and "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

It can be assumed that Plaintiffs have pleaded an injury in fact: paying more to buy, or receiving less to sell, Treasury futures or options than Plaintiffs would have paid or received in an unmanipulated market. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480–81 (7th Cir. 2002) ("There is no dispute that the plaintiffs in these cases have been injured by paying an inflated price for copper . . . ."); *Sanner v. Bd. of Trade of the City of Chi.*, 62 F.3d 918, 924 (7th Cir. 1995) ("The fact of a sale at an allegedly depressed price establishes discernible injury . . . ."). For example, on July 25, 2012, Plaintiffs M&N Trading and Rock Capital "received less when selling Ultra T-Bond Futures contracts" than they would have received in an unmanipulated market. (*Id.* ¶ 97.) On July 24, 2013, Plaintiffs Kohl Trading, M&N Trading, Port 22, and Rock Capital "received less when selling 10-Year T-Note Futures contracts" than they would have received in an unmanipulated market. (*Id.* ¶ 99.) And on May 14, 2014, Plaintiffs M&N Trading and Rock Capital "paid more to purchase Ultra T-Bond Futures contracts" than they would have paid in an unmanipulated market. (*Id.* ¶ 102.)

Plaintiffs' allegations of disparities between realized manipulated prices and unrealized unmanipulated prices might be impermissibly conclusory—and therefore disregarded—because the bare fact that a party paid more for a contract (or sold the

contract for less) than it would have in an unmanipulated market is the legal conclusion of actual damages that a CEA market manipulation claim requires. *See* 7 U.S.C. § 25(a)(1). There are two elements that make up the actual damages requirement: (1) that the plaintiff "transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations," and (2) "that the manipulated prices were to the plaintiff's detriment." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 112 (2d Cir. 2018). Combining those two elements yields the conclusion that Plaintiffs plead: they paid more to buy (or less to sell) contracts than they would have in an unmanipulated market.

Yet Plaintiffs do not plead completely bare legal conclusions. They allege specific dates they bought and sold, and they allege the specific contracts at issue. If push came to shove, those facts might salvage their otherwise conclusory allegations. As the Seventh Circuit has remarked with respect to similar allegations, an assertion that the plaintiff "suffered actual damages and injury in fact due to incurring losses when transacting [specified products] at artificial prices," accompanied by an allegation of the dollar amount plaintiff lost, "would typically satisfy Article III's injury-in-fact requirement." *LJM Partners, Ltd. v. Barclays Cap., Inc.*, 165 F.4th 552, 565–66 (7th Cir. 2026) (emphasis omitted).[1]

In this case, however, push is far from shove, because, even assuming the existence of an injury in fact, Plaintiffs fall short on traceability. In reaching that

[1] Plaintiffs' injuries are compensable by monetary damages, so the injuries are redressable by a judgment. *See Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005).

determination, the following conclusory allegations are disregarded to the extent they purport to discuss causation:

- "As a result of their manipulation, Defendants caused Treasury Futures prices to be artificial throughout the Class Period to illegitimately benefit themselves financially, at the expense of other investors, including Plaintiffs and the Class." (Dkt. 42 ¶ 4.)
- "[Each plaintiff] was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. Defendants spoofed the market for Treasury Futures [and Options] throughout the Class Period, which deprived [each plaintiff] and the Class of the ability to transact in a lawful market that was free of manipulation and caused [each plaintiff] and the Class to pay more to purchase, or receive less to sell, Treasury Futures [and Options]. As a direct and proximate result of the wrongdoing alleged herein, [each plaintiff] was harmed as described below and suffered economic injury as a result." (*Id.* ¶¶ 14–20.) (The complaint repeats this boilerplate for each plaintiff, naming the particular plaintiff where "[each plaintiff]" appears in the quotation. The complaint alleges harm related to "Options" for only some plaintiffs.)
- "As a result of Defendants' unlawful manipulation, Plaintiffs and Class members were injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. . . . As a result of Defendants' spoofing, Plaintiffs . . . were deprived of the ability to transact in

a lawful market that was free of manipulation . . . . These artificial prices caused Plaintiffs . . . to earn fewer profits or suffer greater losses in their trading of . . . contracts during the Class Period." (*Id.* ¶¶ 97, 99, 102.) (The complaint repeats this allegation for three different contracts, each on a different day, with varied plaintiffs alleged for each contract.)

- "Defendants manipulated Treasury Futures' prices throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold at artificially inflated or deflated prices." (*Id.* ¶ 106.)
- "Plaintiffs traded Treasury Futures throughout the Class Period at artificial prices caused by Defendants' manipulation and fraudulent scheme." (*Id.* ¶ 107.)
- "Defendants intended to inject false information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions. As a result of these artificial prices, Plaintiffs and the Class suffered losses on their trades in Treasury Futures." (*Id.* ¶ 148.)
- "Defendants manipulated Treasury Futures' prices throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold at artificially inflated or deflated prices." (*Id.* ¶ 149.)
- "As a result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures and Options [on Treasury Futures], to which Plaintiffs and the Class

would not have been subject but for Defendants' unlawful conduct." (*Id.* ¶¶ 152, 159.)

The remaining allegations that Plaintiffs argue show traceability are, in summary:

- Defendants placed hundreds of spoof orders during the Class Period. (*Id.* ¶ 85.)
- On July 25, 2012, one of Defendants' traders placed and canceled a spoof order to sell 500 Ultra T-Bond Futures contracts. (*Id.* ¶ 96.)
- On July 25, 2012, Plaintiff M&N Trading sold one Ultra T-Bond Futures contract, and Plaintiff Rock Capital sold 163 Ultra T-Bond Futures contracts. (*Id.* ¶ 97.)
- On June 24, 2013, one of Defendants' traders placed and canceled a spoof order to sell 1,000 10-year U.S. Treasury note futures contracts. (*Id.* ¶ 98.)
- On June 24, 2013, Plaintiff Kohl Trading sold 475 10-year U.S. Treasury note futures contracts, Plaintiff M&N Trading sold 2,732 10-year U.S. Treasury note futures contracts, Plaintiff Port 22 sold 1,823 10-year U.S. Treasury note futures contracts, and Plaintiff Rock Capital sold 878 10-year U.S. Treasury note futures contracts. (*Id.* ¶ 99.)
- On May 14, 2014, one of Defendants' traders placed and canceled a spoof order to buy 210 Ultra T-Bond Futures contracts. (*Id.* ¶ 101.)
- On May 14, 2014, Plaintiff M&N Trading bought 137 Ultra T-Bond Futures contracts and Plaintiff Rock Capital bought 20 Ultra T-Bond Futures contracts. (*Id.* ¶ 102.)

Those allegations do not give rise to an inference that Defendants' spoofing caused Plaintiffs' losses. The complaint neither directly links Plaintiffs' trading to Defendants' spoofing (for example, by alleging that Plaintiffs sold to or bought from Defendants at a spoofed price) nor indirectly links Plaintiffs to Defendants by alleging that Plaintiffs traded opposite Defendants' spoofing soon after Defendants spoofed (during the time when prices had not yet returned to an unmanipulated level).

Specific factual allegations connecting Plaintiffs' trading to Defendants' spoofing are crucial to traceability in spoofing cases because "spoofing is a form of manipulation that occurs in short periods of time." *M&N Trading, LLC v. BofA Sec., Inc.*, No. 24-cv-1229, 2024 WL 4651857, at *4 (N.D. Ill. Nov. 1, 2024) (citing *United States v. Coscia*, 866 F.3d 782, 788 (7th Cir. 2017)). Indeed, Plaintiffs allege that Defendants profited from spoofing (*e.g.*, Dkt. 42 ¶ 156), but profits from spoofing are realized only after prices revert to unmanipulated levels. For example, a spoofer who buys at an artificially low price will realize a profit only after selling at the higher, unmanipulated price. *See, e.g.*, *In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, No. 19-cv-6002, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021) (quoting *In re Lond. Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018)) ("Manipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief."), *aff'd sub nom. Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022). Plaintiffs' allegation that Defendants profited from spoofing (in other words, that Defendants benefited from a reversion of prices to

unmanipulated rates) undermines the bare allegation that "Defendants' spoofing had a lasting impact on the markets for Treasury Futures well beyond the time the Spoof Orders were placed" (Dkt. 42 ¶ 109) and thwarts Plaintiffs' reliance on allegations that Plaintiffs traded on the same days that Defendants spoofed.[2]

Cases where federal courts have dismissed spoofing claims for failure to state a claim are instructive as to what must be pleaded to show a connection between Defendants' spoofing and Plaintiffs' trading. Recall that the same plausibility standard applies for Article III standing and for stating a claim. *Silha*, 807 F.3d at 174. Recall also that, to state a claim under the CEA, a private party must allege sufficient facts making it plausible to infer that "actual damages result[ed] from" a prohibited transaction. 7 U.S.C. § 25(a)(1). Because both conditions require a causal connection between the defendant's manipulation and the plaintiff's injury, the "resulting from" component is akin to traceability.

[2] Plaintiffs contest the characterization of the "lasting impact" allegation as conclusory by pointing, in their memorandum opposing the motion to dismiss, to economic research. (Dkt. 71 at 9–10 (citing Emilio Said et al., Market Impact: A Systematic Study of Limit Orders (Sept. 6, 2018) (unpublished manuscript), https://hal.science/hal-01561128v4).) According to Plaintiffs, the Said paper provides "an overview of research on the existence of a permanent price impact from large limit orders executed in smaller chunks (exactly like Defendants' primary orders, which were often placed as iceberg orders [i.e., large single orders that are divided into smaller limit orders for the purpose of hiding the actual order quantity] and filled in smaller pieces at artificial prices caused by Defendants' spoofing. . . .)." (*Id.* at 9.)

Although a party opposing a motion to dismiss "may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove," *Geinosky v. City of Chicago*, 675 F.3d 743, 746 n.1 (7th Cir. 2012), Plaintiffs' proffered research is unavailing because it discusses the effect of iceberg orders like the ones Defendants actually executed, not the unbroken spoof orders that Defendants canceled. If Plaintiffs want to allege traceability by indirectly connecting their trading to Defendants' spoofing, Plaintiffs must allege the duration of the effect of the spoof orders that allegedly violated the CEA, not merely the duration of the effect of any trading by Defendants. *See Lujan*, 504 U.S. at 560 (requiring a causal connection between the injury and the *complained-of* conduct).

In *Gamma Traders*, the Second Circuit affirmed the dismissal of the complaint for failure to plead that the defendants' conduct injured the plaintiffs. 41 F.4th at 74. In that case, the defendants spoofed transactions in precious metals futures and option contracts from 2011 to 2014. *Id.* at 75–77. As set forth in the complaint, the plaintiffs alleged nine days on which they traded opposite the defendants' spoofing, but the plaintiffs did not allege how long it took for the market price to return to an unmanipulated level after a spoof. *Id.* at 80.

In the Second Circuit's view, even if it could be assumed that the plaintiffs traded *after* the defendants on those days (which was not alleged), the complaint was doomed by the lack of facts "to support the inference that the effects of the spoof linger[ed] for the remainder of the trading day" or "that [the plaintiffs'] trades occurred so close in time to [the d]efendants' spoofing as to permit [the court] to infer as a matter of common sense that the market prices were artificial when [the plaintiffs] traded." *Id. Gamma Traders* explained that, although "the effects of a spoof and the duration of the resulting market distortions are pure questions of fact," federal pleading standards "require [the plaintiff] to allege *some* facts that support an inference of actual injury" attributable to the defendants' activity. *Id.* (citing *Iqbal*, 556 U.S. at 678–79). As for the allegation that "[d]efendants' manipulation of the markets for precious metals futures contracts caused prices to be artificial throughout the Class Period," the Second Circuit disregarded that statement as merely conclusory and held that the plaintiffs had not pleaded a plausible connection between their trading and the defendants' spoofing. *Id.* at 80–81.

In addition to rejecting same-day-trading allegations as insufficient, *Gamma Traders* also rejected the plaintiffs' theory that, because the defendants had spoofed thousands of times and the plaintiffs made thousands of trades, it was plausible as a matter of probabilities that the defendants' spoofing affected the price at which the plaintiffs traded. *Id.* at 78–79. For the proposition that pleading "based on rote probabilities" is "generally disfavored," the court relied on a case in the Article III injury-in-fact context. *Id.* at 78 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). With that admonition in mind, the court did not allow the plaintiffs to proceed on their probabilistic theory of actual damages resulting from the defendants' spoofing, because otherwise "any person who traded with even modest frequency could state a CEA claim against a market-manipulating defendant, without ever plausibly alleging that she suffered a loss as a result of the defendant's conduct." *Id.*

*Gamma Traders* has been applied in this District to dismiss CEA claims. In *M&N Trading*, for example, the court dismissed a complaint with substantially similar allegations to those here and in *Gamma Traders*: the plaintiff alleged that the defendants spoofed U.S. Treasury futures from 2014 to 2021, that the plaintiff traded opposite the defendants' spoofing on ten specific days, and that the defendants spoofed on thirty-six other dates. 2024 WL 4651857, at *3. Relying on *Gamma Traders* as persuasive, the court rejected as "not enough" the "conclusory" allegation that "[the d]efendants' spoofing had a lasting impact on the market for Treasury Futures well beyond the time the manipulative spoof orders were placed." *Id.* at 4. Because the plaintiff "did not allege how long prices were artificially impacted

because of [the d]efendants' trades," the court concluded that the plaintiff failed to plead actual damages. *Id.* To avoid dismissal, the plaintiff was required to make "some allegation of timing that allows a common-sense inference to be made" as to the effect of the defendants' spoofing on the plaintiff's trades. *Id.*[3]

Plaintiffs rely on theories of same-day trading and probabilities that *Gamma Traders* and *M&N Trading* considered insufficient because they failed to raise the element of actual damages resulting from the defendants' spoofing above the speculative level. The same standard applies for traceability, so Plaintiffs have not adequately pleaded that any injury of theirs was traceable to Defendants' conduct. For that lack of traceability, Plaintiffs lack constitutional standing, so their complaint cannot be heard in federal court.[4]

---

[3] Although *Gamma Traders* did not comment on constitutional standing, the Second Circuit applies a less-demanding test for standing than it does for stating a claim. *See Gamma Traders*, 41 F.4th at 78 (citing *Harry*, 889 F.3d at 111–12) ("[P]leading CEA injury is more demanding than pleading an Article III injury. . . ."); *Harry*, 889 F.3d at 110–12 (citing *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008)) (concluding that, because "the pleading standard for constitutional standing is lower than the standard for a substantive cause of action," the plaintiffs satisfied Article III by putting standing "within the realm of possibility" but did not satisfy the CEA's requirements because the injury was not "plausible").

*M&N Trading* reached the merits only after holding that the plaintiff had standing, but the court applied the Second Circuit's lower standard, not the Seventh Circuit's plausibility standard, to analyze standing. *M&N Trading*, 2024 WL 4651857, at *2 (citing *Harry*, 889 F.3d at 110) ("Article III standing is a separate question which has a lower pleading standard than that for the substantive cause of action."); *id.* at *3 (quoting *Harry*, 889 F.3d at 112) ("The analysis to establish an actual injury looks very similar to the injury in fact analysis used to determine constitutional standing, however, 'because it is an element of a substantive cause of action, the pleading requirements differ. Injury must be plausible, not just colorable.' ").

[4] Because the Court lacks jurisdiction, it does not address Defendants' merits-based arguments under Rule 12(b)(6). *See Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993) ("[A] court must dismiss the case without ever reaching the merits if it concludes that

## IV. CONCLUSION

Defendants' motion to dismiss the consolidated complaint is granted, and the complaint is dismissed without prejudice.[5]

SO ORDERED in No. 21 C 6816.

Date: September 30, 2026

JOHN F. KNESS
United States District Judge

it has no jurisdiction."); *Ryder v. Hyles*, 27 F.4th 1253, 1258 (7th Cir. 2022) (quoting Fed. R. Civ. P. 41(b)) (dismissal under Rule 12(b)(6) "operates as an adjudication on the merits").

[5] Plaintiffs have requested leave to amend and to conduct certain discovery before amendment (Dkt. 71 at 10). Leave to amend is granted (*see, e.g.*, *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004)), as is the request to conduct some discovery before the filing of any amended complaint. Those matters will be addressed more fully by separate order.